UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RAYMOND CLYDE,

                              Petitioner,

                                                    9:13-CV-00101
v.
                                                    (NAM/TWD)

DAVID ROCK,

                              Respondent.
_____

APPEARANCES:                        OF COUNSEL:

RAYMOND CLYDE
96-A-2453
Petitioner *pro se*
Upstate Correctional Facility
P.O. Box 2001
Malone, New York 12953

HON. ERIC T. SCHNEIDERMAN          PRISCILLA STEWARD, ESQ.
Attorney General for the State of New York    LEILANI RODRIGUEZ. ESQ.
Counsel for Respondent              Assistant Attorneys General
120 Broadway
New York, New York 10271


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER and REPORT-RECOMMENDATION**

## I.    INTRODUCTION

This matter has been referred to this Court for Report and Recommendation, pursuant to

28 U.S.C. § 636(b) and Northern District Local Rule 72.3(c), by the Hon. Norman A. Mordue,

Senior United States District Judge.

### A.    Challenged Conviction

Presently before this Court is the timely *pro se* Petition of Petitioner Raymond Clyde,

seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Dkt. No. 1.) Petitioner brings this proceeding challenging a judgment of conviction entered on March 24, 2008, following a December 2007 jury trial in Cayuga County Court, the Hon. Robert B. Wiggins, Acting County Court Judge, presiding. (Dkt. No. 14-3 at 1[1].) On December 7, 2007, Petitioner was convicted of attempted rape in the first degree (Penal Law §§ 110.00,130.35(1)); two counts of assault in the second degree (Penal Law § 120.05(7)); one count of unlawful imprisonment in the first degree (Penal Law § 135.10); and one count of promoting prison contraband (Penal Law § 205.25). (Dkt. No. 14-26 at 453-56.) After the verdict was rendered by the jury, Judge Wiggins issued a trial order granting Petitioner's motion to dismiss the attempted rape in the first degree charge on the grounds of legal insufficiency of the evidence. *Id*. at 239-40, 481-82, 493-94; Dkt. No. 14-27 at 135-37.

**B.      Sentence Imposed**

On March 24, 2008, Petitioner was sentenced as a persistent felony offender to an aggregate of thirty-seven years to life in prison. (Dkt. No. 14-26 at 480, 496.) An indeterminate sentence of twenty-five years to life was imposed on the assault in the second degree conviction involving V.W.[2], a civilian employee at Auburn Correctional Facility, with the sentence to run consecutive to any existing term presently being served by Petitioner. *Id*. at 496-97. Petitioner was sentenced to twelve years to life on the assault in the second degree conviction involving another Auburn Correctional Facility civilian employee Anthony Rebich ("Rebich"), with the

---

[1]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[2]  The victim is identified herein as V.W. in order to protect her privacy.

sentence to run consecutively to existing terms being served by Petitioner and to the sentence imposed on the other assault in the second degree conviction. (Dkt. No. 14-26 at 497.) On promoting prison contraband in the first degree, Petitioner was sentenced to an indeterminate three and a half to seven year term to run concurrently with the assault in the second degree conviction. *Id*. at 498. The sentence imposed on the unlawful imprisonment in the first degree conviction was two to four years indeterminate, concurrent with the existing sentence. *Id*.

### C. State Court Appeals

1. <u>Initial Appeals to the Appellate Division Fourth Department</u>

Petitioner, who had represented himself at trial, pursued a counseled appeal from the conviction to the Appellate Division Fourth Department ("Appeal No. 1").[3] (Dkt. No. 14-27 at 8.) The People appealed from Judge Wiggin's dismissal of the attempted rape in the first degree charge ("Appeal No. 2"). *Id*. at 5-6. On April 30, 2010, the Appellate Division affirmed in part and reversed in part. *People v. Clyde*, 899 N.Y.S.2d 757 (4th Dep't 2010). On Appeal No. 1, the Appellate Division, with one dissent, ordered that the judgment of conviction be reversed on the law and a new trial be granted on all of the charges except for the attempted rape in the first degree charge that had been dismissed by Judge Wiggins. *Id*. at 758. The ground for the reversal was the County Court's failure to articulate a reasonable basis on the record for its determination to restrain Petitioner in shackles during the trial. *Id*. On Appeal No. 2, the Appellate Division affirmed the County Court's grant of Petitioner's motion for a trial order of dismissal with respect to the attempted rape in the first degree charge. *Id*. The affirmance was based upon the

---

[3] Petitioner also submitted a *pro se* Brief in response to the People's Brief on the appeal to the Appellate Division. (Dkt. No. 14-3.)

Appellate Division's conclusion that the evidence of Petitioner's intent to rape the victim by the use of forcible compulsion was legally insufficient.  (Dkt. No. 14-27 at 758.)

### 2. Appeal to the New York Court of Appeals

The People moved in the Appellate Division for a certificate granting leave to appeal the Court's Order on Appeal Nos. 1 and 2 to the New York Court of Appeals.  (Dkt. No. 14-6 at 2-3.)  The motion was opposed by Petitioner's appointed appellate counsel and Petitioner.  (Dkt. Nos. 14-7; 14-8.)  The People were granted leave to appeal to the Court of Appeals.  (Dkt. No. 14-9.)  On November 22, 2011, the Court of Appeals, in a 4-3 Decision, reversed the Order of the Appellate Division in Appeal No. 1 reversing the County Court's judgment of conviction.  The Court of Appeals remitted the case to the Appellate Division for consideration of the facts and issues raised but not determined on the appeal to that Court from the judgment.  The Court of Appeals also reversed the Appellate Division's Order on Appeal No. 2, which had affirmed the County Court's Order dismissing the attempted rape in the second degree charge against Petitioner.  *People v. Clyde*, 938 N.Y.S.2d 243, 250 (2011).  Petitioner's counseled petition for a writ of certiorari was denied by the United States Supreme Court on April 16, 2012.  *See Clyde v. New York*, ___ U.S. ___ 132 S.Ct. 1921 (2012).

### 3. Remittitur to the Appellate Division on Appeal No. 1

On December 30, 2011, the Appellate Division unanimously affirmed the judgment of the County Court.[4]  *People v. Clyde*, 935 N.Y.S.2d 795 (4th Dep't 2011).  The Appellate Division rejected Petitioner's claim that the County Court had violated his constitutional rights by

---

[4] The Appellate Division did not have Appeal No. 2 dealing with the dismissal of the attempted rape in the first degree conviction before it.  *See People v. Clyde*, 935 N.Y.S.2d 795, 797 (4th Dep't 2011).

permitting him to represent himself. *Id*. at 797. The Appellate Division further found that the County Court had not erred in sentencing Petitioner as a persistent violent felony offender, and that the sentence imposed by the County Court was not unduly harsh or severe. *Id*. The Court of Appeals denied leave to appeal. *People v. Clyde*, 950 N.Y.S.2d 354 (2012).

### 4. Remittitur to the County Court on Appeal No. 2

On Appeal No. 2, the Court of Appeals remitted the matter to the County Court for sentencing on the reinstated conviction for attempted rape in the first degree. *People v. Clyde*, 938 N.Y.S.2d 243, 250 (2011). According to Respondent, Petitioner was sentenced to twenty-five years to life on the attempted rape in the first degree charge, with the sentence to run concurrently with Petitioner's previously imposed sentences. (Dkt. No. 13-1 at 5.) On June 28, 2013, the Appellate Division summarily affirmed the judgment rendered by Judge Wiggins on February 1, 2012. *People v. Clyde*, 967 N.Y.S.2d 862 (4th Dep't 2013).

### D. Grounds For Habeas Review

Petitioner has asserted four grounds for habeas review:

> (1) Trial court's violation of Petitioner's rights under the Fifth, Sixth and Fourteenth Amendments by denying assigned counsel an adjournment to properly prepare for trial to provide effective assistance of counsel (Dkt. No. 1 at 5);

> (2) Trial court's denial of Petitioner's rights under the Fifth, Sixth and Fourteenth Amendments by failing to conduct a sufficiently searching inquiry before allowing Petitioner to waive his right to counsel, *id*. at 6;

> (3) Trial court's denial of Petitioner's rights under the Fifth, Sixth and Fourteenth Amendments by requiring him to be shackled in leg irons throughout the trial, *id*. at 8; and

> (4) Denial of Petitioner's rights under the Fifth, Sixth and

5

Fourteenth Amendments based upon a finding of guilt on the charge of attempted rape in the first degree with insufficient evidence. *Id*. at 9.

For the reasons discussed below, the Court recommends that Petitioner's Petition (Dkt. No. 1) be denied and dismissed in its entirety.

## II.     BACKGROUND

### A.     Relevant Pretrial Matters

#### 1.     Indictment

On February 22, 2007, Petitioner was indicted on one count of attempted rape in the first degree, two counts of assault in the second degree, and one count of unlawful imprisonment in the first degree, and promoting prison contraband in the first degree in a sealed indictment issued by a Cayuga County grand jury. (Dkt. Nos. 14-27 at 22-23, 143.) All of the charges, with exception of the charge for promoting prison contraband, arose out of an incident that occurred on July 7, 2006, at the Auburn Correctional Facility where Petitioner was an inmate. *Id*. The charge of attempted rape in the first degree, the first of the two assault in the second degree charges, and the unlawful imprisonment in the first degree charge involved Petitioner's alleged attack on V.W. *Id*. The other charge of assault in the second degree involved the assault of Auburn Correctional Facility civilian employee Rebich. *Id.*

#### 2.     Arraignment

Petitioner was arraigned in Cayuga County Court before the Hon. Mark H. Fandrich, Acting County Court Judge, on March 20, 2007. (Dkt. No. 14-24 at 1-7.) Petitioner appeared at the arraignment with appointed counsel Douglas Bates, Esq., ("Bates"), who represented Petitioner throughout the pre-trial proceedings. *Id*. at 2.

3.      <u>Shackling at Trial</u>

Oral argument on omnibus motions was held before Judge Fandrich on May 15, 2007. (Dkt. No. 14-24 at 8-23.) Petitioner's counsel moved for an order directing that Petitioner be allowed to appear in street clothes and not be seen by the jury in shackles and handcuffs at trial. *Id*. at 10; Dkt. No. 14-27 at 58, 61-62. Cayuga County District Attorney, James B. Vargason ("Vargason"), noted that Petitioner had numerous prior convictions for robbery, rape, sodomy, and burglary and expressed concern that he was a "supremely dangerous individual with a great risk of flight." *Id*. at 13. Vargason advised the court that he had no objection to Petitioner wearing street clothes and having his handcuffs removed at trial. *Id*. However, he suggested that the issue of shackles be left until trial when the sitting judge, in connection with escorts from the Department of Corrections and Community Supervision ("DOCCS"), could determine the risk level and their comfort level in removing Petitioner's shackles. *Id*. Judge Fandrich agreed to allow Petitioner to wear street clothes at trial but left issues regarding shackling and control of Petitioner to be decided by the trial judge. *Id*. at 21-22; Dkt. No. 14-27 at 13.

Prior to the start of jury selection, Bates raised the shackling issue again. (Dkt. No. 14-24 at 114.) Bates noted that Judge Wiggins, the trial judge, had indicated that if Petitioner wished, the court would require that a curtain be installed around the defense table to hide the shackles. *Id*. Bates expressed concern that Petitioner would be precluded from attending side-bar conferences because the jury could not help but notice the shackles if Petitioner walked to the bench. (Dkt. No. 14-24 at 114-15.) Judge Wiggins asked Petitioner if he wanted to be able to attend side-bar conferences and noted that there would be no value in having a curtain around the defense table if Petitioner was going to be walking to the bench. *Id*. at 115-16. Petitioner

responded in the affirmative and agreed to waive the curtain. *Id*. at 116.

4.  Transfer of Petitioner Closer to Cayuga County for Trial Preparation

On October 5, 2007, Judge Fandrich granted Bate's request for an order providing for Petitioner to be transferred from Upstate Correctional Facility ("Upstate") in Malone, New York, where he was being housed, to a facility closer to Cayuga County at least three or four weeks before trial so that he and Petitioner could prepare for trial. (Dkt. No. 14-24 at 94.) Judge Fandrich agreed to issue an order having Petitioner transferred to Five Points Correction Facility ("Five Points") thirty days before trial. *Id*.

At a pretrial conference held before Judge Wiggins on October 19, 2007, Bates informed the Court that he and Petitioner were ready for trial. (Dkt. No. 14-24 at 101.) Bates also told Judge Wiggins that Judge Fandrich had agreed to issue an order directing that Petitioner be moved to prison facilities more proximate to Auburn Correctional Facility within thirty days of trial. *Id*. at 100. On November 7, 2007, Judge Wiggins issued an order indicating that the matter was scheduled for trial on December 3, 2007, in Auburn, and that it appeared that effective assistance of counsel required that Petitioner, who was still being housed at Upstate, be transferred to a closer facility until the conclusion of the trial or issuance of a subsequent order. *Id*. at 119-20. The order directed DOCCS to transfer Petitioner on or about November 3, 2007, to the nearest correctional facility in the proximity of Auburn, after taking due consideration for the needs of security, safety, and control of Petitioner. (Dkt. No. 14-27 at 119-20.)

5.  Petitioner's Request for An Adjournment of the Trial

On the morning of December 3, 2007, the date Petitioner's trial was scheduled to commence, Bates informed Judge Wiggins that despite his transfer order, Petitioner had not been

transferred to Five Points until November 29, 2007. (Dkt. No. 14-24 at 111, 119.) Petitioner was not available to receive visitors until November 30, 2007, which left only three days before trial for preparation. *Id.* Bates explained to the court that he had spoken to Petitioner every time he had appeared in court but wanted it noted in the record that discussions on those occasions were always in the presence of corrections officers. *Id.* at 120. Bates did not believe Petitioner felt at liberty to speak freely in the presence of the officers. *Id.* Bates informed the court that Petitioner believed that the late transfer and lack of sufficient time presented a denial of his constitutional right to effective assistance of counsel and that he wanted an adjournment of the trial. *Id.*

Vargason objected inasmuch as Bates had been earnestly and aggressively engaged in Petitioner's defense since his arraignment; had engaged in significant motion practice on Petitioner's behalf; had been to Vargason's office on more than one occasion to discuss the case; made all of the appropriate motions to suppress the identification of the Petitioner; participated in a *Wade* Hearing; and had attended a number of pretrial conferences. *Id.* at 120-21.

Judge Wiggins stated that he did not perceive the late transfer as a question of effective assistance of counsel but rather as a question of availability based on failure to transfer. *Id.* at 121. Petitioner was allowed to speak to the issue and stated that since his arraignment, he had only been able to speak to Bates for ten to fifteen minutes prior to court appearances. (Dkt. No. 14-24 at 122.) According to Petitioner, Bates had not come to Malone to discuss the facts pertaining to the case despite numerous requests by Petitioner, telling Petitioner that it was too soon for trial preparation, and that he would ask that Petitioner be transferred prior to trial so that they could meet for preparation. *Id.*

9

Petitioner told the court that when he met with Bates after his transfer, he told Bates he wanted certain witnesses subpoenaed for trial. *Id*. at 123. Petitioner claims to have asked Bates if he had an investigator and a medical expert to go over medical documents pertaining to injuries sustained, and that Bates responded that he did not know what he could do about it because of the trial date. *Id*. at 124. According to Petitioner, Bates told him that they could go to court and ask for an adjournment. *Id*. Petitioner informed the court that he and Bates had no trial strategy as far as documents and had not really spoken about witness testimony or Petitioner testifying. *Id*. Plaintiff also told the court that Bates had told him that he was not prepared to try the case. *Id*. Petitioner also mentioned that Bates had informed him that Vargason's term expired at the end of December, so that if the trial was adjourned for more than a short time, Vargason would not be in a position to try the case. *Id*. at 125.

Bates, stating that he was speaking as an officer of the court, informed Judge Wiggins that he had not told Petitioner he was unprepared for trial. *Id*. at 126. Judge Wiggins, noting that the matter had been scheduled for trial some time ago, and that neither the court or counsel was responsible for the failure to comply with the court's transfer order, denied Petitioner's request for an adjournment. *Id*.

### 6.   Petitioner's Decision to Represent Himself at Trial

Following the court's denial of Petitioner's request for an adjournment and an off-the-record conference between Petitioner and Bates, Bates informed the court that Petitioner wanted to represent himself at trial. (Dkt. No. 14-24 at 132.) Judge Wiggins reminded Petitioner of the seriousness of the charges against him and described giving up the assistance of a highly experienced attorney who appeared to be receptive to his suggestions and to conversing with him

as "an extremely dangerous step for [him] to make." *Id.* at 132-33. Vargason had indicated the People's intent to have Petitioner sentenced as a persistent felony offender in the event of a determination of guilt at trial, and the court reminded Petitioner of the huge downside risk of a persistent violent felon conviction. *Id.* at 133. Judge Wiggins directed Petitioner to take five minutes to discuss self-representation with Bates because the magnitude of the decision was extreme, and the court needed Petitioner to explore it thoroughly with his attorney before he shot from the hip as to *pro se* representation and regretted it down the road. *Id.*

After speaking with Bates, Petitioner advised Judge Wiggins that he still wished to represent himself at trial. *Id.* at 134. Judge Wiggins cautioned Petitioner that the court would not give him any more latitude as to trial protocol and rules, and that he would be held to the same standards as Bates. *Id.* The court asked Petitioner if he had been given enough time to consider the issue of self-representation and then questioned him regarding his educational background; physical and mental condition; employment history; understanding of the charges against him; understanding of the function of the court and jury at trial; whether he had prior experience that would enable him to conduct proper examination of witnesses; and whether he understood that he would not be able to give speeches during trial and would have to conduct cross-examination in a professional manner. (Dkt. No. 14-24 at 134-40.)

Judge Wiggins then asked Petitioner if he had any difficulty understanding his attorney's advice, to which he responded he had not. *Id.* at 140. The Court asked Petitioner why he wanted to represent himself, to which he responded that he and Bates had not had enough time to prepare, and he did not believe Bates was ready for trial. *Id.* The court proceeded to advise Petitioner of the dangers of self-representation, including the lack of legal training, which could

11

lead to the conviction of an accused who was not guilty. *Id*. at 141-42. Judge Wiggins also cautioned Petitioner that most *pro se* representations were unsuccessful. *Id.*

Judge Wiggins instructed Petitioner that if he chose self-representation, he would not be entitled to aid from an attorney throughout the proceedings, including with his own testimony if he elected to testify. *Id.* at 143. When Petitioner indicated that he did not understand, Judge Wiggins explained that although he would mandate that Bates be available through trial, and that Bates would be available if Petitioner needed his advice, it would not be the same as an attorney-client relationship. *Id.* Bates would not be calling the shots, making decisions, or advising Petitioner on strategy. *Id.*

The court continued to caution Petitioner that he would be held to the same legal standards as an attorney; that he would not be entitled to any special breaks or rulings; and that there might well be legal terms of art he did not understand and, as a result, Petitioner would not have a good understanding of what was happening. *Id.* at 144. Judge Wiggins cautioned Petitioner that legal professionals incorporated entire legal concepts in case names, and that a layman might not understand what the cases stood for when used during trial. *Id.* at 144-45. The court went on to explain the complexities of the rules of evidence and that Petitioner would be subject to those rules despite not being an attorney, and that he would run the risk of having evidence precluded because of his inability to provide legal explanations for its admissibility. (Dkt. No. 14-24 at 145-46.)

Judge Wiggins told Petitioner that he would be required to do his own opening and closing at trial without the advice of an attorney and noted that he would be going up against Vargason, who was highly trained and highly experienced and had been the District Attorney for

sixteen years. *Id.* at 147. The court cautioned Petitioner that Vargason would not be easy on him or forego making objections he would make were Bates representing him. *Id*. at 148. The court reminded Petitioner that he would be giving up the benefits of Bates' courtroom experience and legal training and his ability to communicate with a jury. *Id*.

Judge Wiggins then asked Petitioner if he believed he was capable of representing himself and if he still wanted to represent himself, and Petitioner responded in the affirmative to both questions. *Id*. at 148-49. The court warned Petitioner that if he did not conduct himself in every way as if he were an attorney and undermined the fair and orderly presentation of the issues at trial, he would be removed from the courtroom. *Id*. at 149-50.

At Vargason's suggestion, the court then gave Petitioner an opportunity to speak with Bates and think about his decision to represent himself. *Id.* at 150. After that opportunity, Petitioner informed the court he still wanted to represent himself and executed a Waiver of Assigned Counsel asserting his desire to waive his right to counsel and proceed *pro se. Id*. at 151; Dkt. No. 14-27 at 121.

**B.** **People's Case**

1. <u>V.W.</u>

V.W. began working as a civilian motor vehicle operator at Auburn Correctional Facility in 1995 and was at the facility working in that capacity on Friday, July 7, 2006. (Dkt. No. 14-26 at 166-67.) After lunch, V.W. left the facility to pick up the UPS packages. *Id*. at 179. V.W. then drove back to the facility to make her deliveries. *Id*. at 180. After making deliveries in the industry storage area, V.W. headed towards the facility storehouse. *Id*. After going through a security gate, V.W. drove down an alleyway where the back of the mess hall dock is located,

made a right and backed her truck up to the storehouse.  (Dkt. No. 14-26 at 180.)

At about 12:15pm, V.W. locked the truck, put the keys in her pocket, and headed into the storehouse because it was not quite time for the storehouse inmates to come back from lunch to unload the UPS packages.  *Id*. at 181-82.  V.W. saw Auburn Correctional Facility civilian employees Greg Schramm ("Schramm" ) and Rebich in the storehouse.  *Id*. at 182.  V.W. asked Rebich to phone the recreation area to have the storehouse inmates come back, and she got the storehouse keys used to open big double doors to get to the corridor leading to the recreation area from Rebich so that she could escort the inmates back to the storehouse.  *Id*. at 183.  After leaving the storehouse, V.W. went through the double doors, leaving them open as was the practice, and walked down a long corridor.  *Id.* at 184.  At the end of the corridor was a big metal gate that blocked the corridor from the mess hall.  *Id*.  The gate was always locked and an officer had the key.  *Id*.

V.W. waited alone in the corridor by the mess hall gate for the escort officer to bring the storehouse inmates to the gate.  (Dkt. No. 14-26 at 185-87.)  There were a number of inmates going from the recreation area to the mess hall in the corridor on the other side of the gate, and there was a lot of inmate commotion.  *Id*.  After about five minutes of waiting, V.W. concluded that either Rebich had neglected to call for the storehouse inmates or the inmates were not ready to come back.  *Id*. at 187.  V.W. decided to walk back to the storehouse.  *Id*.

On her way down the hallway back to the storehouse, V.W. stopped to retrieve a cart to use to unload UPS packages from her truck.  *Id*. at 189-90.  V.W. turned around to grab the cart when she was suddenly jumped from behind.  *Id.* at 189.  Immediately a hand came over her mouth and nose, and she couldn't breathe.  *Id*. at 189.  Her attacker was holding her in a

headlock, very tightly and very, very close to him. *Id.* V.W. was able to say "please don't hurt me" to him. *Id.* V.W. asked him what he wanted and her attacker would not answer her. *Id.*

After the two had wrestled a little and gotten turned back around towards the kitchen, V.W.'s attacker slammed her up against the wall. *Id.* Her attacker started shoving a terry cloth textured item she thought to be a sock or towel ("cloth") into V.W.'s mouth so that she could not breathe. *Id.* at 188, 202. V.W. was able to get the cloth out of her mouth and scream for help. *Id.* Her attacker told her to "shut the fuck up or I'll kill you," and at the same time shoved his fist hard against her kidney. *Id.* at 189-90. They got turned around again and the cloth went back into her mouth. *Id.* at 190. He shoved her down on her knees onto the floor. *Id.* Because her attacker was behind her, she could not see him. *Id.*

Her attacker then yanked the back of her head and her hair, and he yanked her neck as far back as he could get it. *Id.* He kept shoving the cloth down V.W.'s throat as far as it would go and then covered her mouth and nose completely so that she could not breathe at all. *Id.* V.W. could feel her eyes rolling in the back of her head, and thought she was going to pass out. (Dkt. No. 14-26 at 190.) V.W. was able to get enough air in to say in a small voice, "okay, just don't hurt me, whatever you want." *Id.* V.W.'s attacker them shoved her to the floor, and her face bounced off the cement. *Id.* The cloth item came out of her mouth again, and she tried to get some oxygen because she could not breathe. *Id.*

V.W. tried to scream and her attacker shoved the cloth into her mouth again. *Id.* V.W. attempted to bite him as he was shoving the cloth down her throat. *Id.* at 195. She latched on to whatever part of his hand was in her mouth and bit him as hard as she could. *Id.* V.W. thought that the only reason she could not bite through her attacker's hand was that he had leather gloves

on. *Id*. at 196. Her attacker pulled his hand out of her mouth when she bit him. *Id*. at 204.

V.W.'s attacker then punched her in the face as hard as he could, leaving her dazed. *Id*. at 190. V.W.'s hands were in front of her, and her attacker said "give me your fucking hands." *Id*. at 191. V.W. gave her attacker one hand, and he had it hard behind her back and was wrapping a cord or something behind it. *Id*. He asked for the other hand, and when V.W. did not give it to him, her attacker straddled her, sitting on her back. *Id*. He eventually got both of V.W.'s hands behind her back. *Id*. Petitioner did not remove any of V.W.'s clothing, put his hands under her clothing, or grope her body. *Id*. at 198, 205, 210.

Just then, the doors were flung open, and Rebich screamed at V.W.'s attacker and began running towards V.W. *Id*. at 191-92. V.W.'s attacker jumped off of her and began running towards Rebich, who tripped the attacker to try to get him down. *Id*. at 192. V.W. jumped up, got the string or rope or cord off her hands and ran to the gate screaming for help. *Id*. V.W. was never able to see her attacker's face but could see enough out of the corner of her eye to tell that he was Black and had a white shirt on. (Dkt. No. 14-26 at 194-95.) When her attacker ran away up the hall, she could tell he was wearing mess hall whites. *Id*. at 195.

V.W. was initially treated at the Auburn Correctional Facility by Registered Nurse Susan Lennox ("Lennox") before being transferred to the hospital emergency room. *Id.* at 156, 159. V.W. told Lennox that she thought her attacker had tried to rape her. (Dkt. No. 14-26 at 208.) Lennox documented a cut over V.W.'s left eyebrow, a bruised right cheek, an abrasion on the right side of her mouth, and a cut lower lip. *Id*. at 159-60. There was some redness on her torso, and V.W. complained that her neck and shoulder on the right side of her body hurt. *Id.* at 160. There was a cut on the palm of her left hand and bruising on top of her left hand. *Id*. V.W. also

had cuts on her right lower shin area.  *Id*.  Lennox described V.W. as "a wreck," "very upset," "crying," and "totally distraught."  *Id*.

At the hospital emergency room, V.W. was treated by Dr. Barbara Connor who observed multiple bruises on V.W.'s right hand, right knee, and left knee and lower leg as well as abrasions to V.W.'s elbows and palms, legs and face, including a black eye.  (Dkt. No. 14-26 at 220.)  Dr. Connor also observed that V.W. had abrasions, tenderness and bruising about her jaw and mouth and cuts in her mouth.  *Id*.  V.W. also had areas of tenderness in her back and neck and pain on movement and muscle spasms in her neck.  *Id*.

Based upon Dr. Connor's physical examination of V.W., her clinical impression was that V.W. had significant injury from attempted choking and attempted asphyxiation, and that V.W. had clearly struggled against her attacker and had been forced on her hands and knees.  *Id*.  Dr. Connor also concluded that V.W. had suffered an injury to her airway as a result of her attacker attempting to shove the cloth in her mouth, and with pulling back on her neck there was serious risk of asphyxiation and cutting off her oxygen that would lead to possible respiratory arrest and cardiac arrest and death.  *Id* at 221.

2.    Rebich

Rebich has been principal store clerk, facility storehouse, a civilian position, at Auburn Correctional Facility since around 1994.  (Dkt. No. 14-25 at 66.)  He was working in that capacity in the facility storehouse on July 7, 2006.  (Dkt. No. 14-25 at 66.)  Schramm, who normally works in the business office as inventory control clerk was working with him in the storehouse that day.  *Id*. at 68.

Rebich explained that the main point of ingress to the storehouse area was through the

17

south mess hall, through the back of the kitchen, up an L-shaped hallway, and through the double doors into the storehouse. (Dkt. No. 14-25 at 66.) The correction officer working there, the mess hall staff, and Rebich had keys to the double doors. *Id*. Inmates would never be allowed to have keys. *Id*. at 69. There were four or five inmates working in the facility storehouse on July 7, 2006. *Id*. at 69. Petitioner was not a part of the inmate crew in the facility storehouse and to Rebich's knowledge did not have access to the storehouse and would not have been permitted in the storehouse on July 7, 2006. *Id*. at 69-70.

A double door at the main loading dock and a roll up overhead door at the secondary loading dock also provided access to the storehouse. *Id*. at 70. Normally, especially in the summer when it was hot, the double doors and overhead door were left open to get air flow. *Id*. That was the case on July 7, 2006. *Id*. Inmates were not allowed in the area where the doors were located without an escort. *Id*. at 71.

Rebich saw V.W. at around 12:15pm on July 7, 2006. *Id*. at 74. Part of her duties once she finished her outside driving was to come to the storehouse to bring the UPS down and to give them a hand in the storehouse. *Id*. at 75-76. V.W. obtained the keys to the double door and gate in the mess hall kitchen from Rebich and went to the mess hall kitchen recreation area to get the storehouse inmates who would unload the van with the UPS packages or whatever else was in it. *Id*. at 78-80.

Rebich was doing paper work and heard a noise that sounded as though someone was startled. (Dkt. No. 14-25 at 80.) It was a woman's voice. *Id*. The noise was coming from the hallway to the kitchen. *Id*. Rebich went back to his work and a couple of seconds later heard another noise that sounded more like a muffled scream coming from the hallway, at which point

Rebich went to check it out.  *Id*.  Rebich grabbed his cordless phone which had a built in alarm.  *Id*. at 81.  When Rebich left the office, he saw that the doorway to the hallway was closed, which was odd since V.W. would be coming right back up through the hallway to the storehouse.  *Id*. at 81-82.  The doors were not locked.  *Id*. at 82.

Rebich opened the door and when he looked into the security mirror in the far corner of the first leg of the hallway, he saw V.W. just around the corner.  *Id*. at 82-83.  She was laying on her stomach, and Rebich saw an inmate wearing a white mess hall shirt and pants trying to tie her hands behind her back with strips of cloth.  *Id*. at 84.  V.W. was struggling, and Rebich heard her scream at her attacker "please don't do this to me or why are you doing this to me."  *Id*.  Rebich activated the phone alarm.  *Id*.  Rebich headed towards V.W. and yelled "hey" to the inmate who got up and started running towards Rebich with his right hand behind his back.  *Id*. at 84-85.  Rebich stuck his leg out, hit the attacker on the back and knocked him to the floor.  *Id*.  When the attacker got up, he came back towards Rebich and hit Rebich between the right eye and right temple with his fist.  (Dkt. No. 14-25  at 85.)  Rebich was knocked unconscious for a short time.  *Id*. at 85-86  When Rebich regained consciousness, he chased the attacker up the hallway towards the store house.  *Id*.  at 85.  The attacker went through the double doors to the secondary loading dock and jumped off the lot, turned left and headed around the side of the mess hall.  *Id*. at 86.

Rebich then went back to V.W., who was screaming for help.  *Id*. at 87.  According to Rebich, V.W. was absolutely hysterical.  *Id*. at 87.  She had her hands up and was shaking like a leaf.  *Id.*  She kept saying that her attacker had tried to rape her.  *Id.*  A medical team came to the storehouse office, and Rebich was able to get V.W. calmed down enough to walk to his office.  *Id.* at 88.

Rebich, who initially declined medical treatment in the infirmary on the day of the attack awoke with a pounding headache the next morning, a Saturday, and slept excessively and experienced blurred vision over the weekend. *Id*. at 93-4. He went to the hospital emergency room on Monday morning and was diagnosed with a concussion by Dr. Mervyn Whelen. *Id*. at 95; Dkt. No. 11-26 at 81-83. Rebich also suffered an aggravation of a pre-existing rotator cuff injury. (Dkt. No. 14-25 at 95-96.) Rebich missed ten weeks of work as a result of his injuries. *Id*. at 96.

### 3.    Gregory Schramm

Schramm was in the facility storehouse setting up the computer for inventory control on July 7, 2006. (Dkt. No. 14-25 at 146.) He saw V.W. come into the storehouse at around 12:30pm and heard her ask Rebich for the keys and tell him she was going to get the inmates. *Id*. at 148. According to Schramm, after V.W. left to get the inmates he heard some muffled noises, and his first thought was that V.W. had fallen and twisted her ankle. *Id*. at 151. He assumed it was V.W. because the noise was coming from the direction to which she departed, and she was the only woman down there. (Dkt. 14-25 at 151.) It sounded as though she was crying in a low, muffled voice, and Schramm told Rebich he should go check on her. *Id*. at 153.

Schramm, who stayed behind in the storehouse, heard Rebich yelling pretty loudly and looked through the windows of his office and saw Rebich with V.W.'s attacker. *Id*. at 154. Schramm, who was approximately twenty-five to thirty feet away, saw the attacker throw Rebich against the wall and then throw him against the other wall, and Schramm jumped out of the office to intercede. *Id.* at 154-55. Schramm was able to observe the attacker and get a good look at his face while he was fighting with Rebich. *Id*. at 160. According to Schramm, the attacker

was Black.  *Id.*

Schramm ran towards the attacker in an attempt to distract his attention away from Rebich.  *Id.* at 155.  The attacker immediately stopped and looked at Schramm and ran up the hallway at him.  *Id.*  However, just at the time he got to Schramm, the attacker took a left and went out the storehouse dock into a large open area with an alleyway leading to the back of the mess hall.  *Id.*  at 157-58.

###### 4.  Petitioner's Activities on July 7, 2006

Sergeant Brian Brown ("Brown"), who was working as second officer in the kitchen area of the mess hall on July 7, 2006, and was familiar with Petitioner, testified that Petitioner generally arrived for work in the portion room located in the back of the mess hall around 6:00am in morning.  (Dkt. No. 14-25 at 226-27.)  Brown saw Petitioner in the mess hall on July 7, 2006, probably when he came in and at times during the day.  *Id.* at 528.  Petitioner, like all inmates working in the mess hall, wore mess hall whites while working in the portions room.  *Id.*

Petitioner was not allowed to leave the work area during his detail without speaking with an officer.  (Dkt. No. 14-25 at 227.)  Petitioner did not speak with Brown about leaving on July 7, 2006, and Brown did not see him leave.  *Id.*  Brown did not learn that Petitioner had left the mess hall until after the attack on V.W.  *Id.* at 230-31.  However, at approximately 7:30am, Sergeant Craig Diego ("Diego"), who was working in the south control center on July 7, 2006, observed Petitioner on a camera located in the control center as Petitioner was lingering in a secluded alleyway near the bathroom.  *Id.* at 262-64.  Petitioner was wearing mess hall whites. *Id.* at 268.  Inmates were not allowed in the back alleyway when the mess hall was not running. *Id.* at 263.  Diego had also observed Petitioner in the alleyway the day before and asked him why

he was out there since he was not supposed to be.  *Id.*  That was the first day Diego had seen him out there.  *Id*. at 267.

When Diego saw Petitioner in the alleyway a second time on July 7, 2006, he told him to come over to the control center and asked him why he was there since Diego had counseled him against being there the day before.  *Id*. at 265.  Petitioner told Diego he had lost his hat during the feed up or something like that.  *Id*.  Diego told Petitioner he was not to come out the back of the mess hall, only the front door.  *Id*.  The alleyway was used by teachers going to the school and civilian workers going to the shops, and according to Diego, inmates, especially mess hall inmates, were not supposed to be back there.  *Id*. at 267.

The second time Diego saw Petitioner in the alleyway on July 7, 2006, Petitioner went off camera for a brief period of time.  *Id*. at 269.  Petitioner went over to the left which was near the bathhouse door.  *Id*.  Petitioner was still in his mess hall whites the second time Diego saw him in the alleyway.  *Id*. at 269.

After the attack on V.W. was over, inmates in Brown's assigned work area were taken to the recreation area inside the kitchen area and then to the south mess hall.  (Dkt. No. 14-25 at 231.)  They were frisked and checked for wounds on their hands.  *Id*.  Petitioner was not among the inmates in the south mess hall after the incident.  *Id.*  He was found in the yard.  *Id*.  As far as Brown knew, Petitioner had not been given permission to be in the yard.  *Id.* at 232.  There would have been no reason for an inmate on portions duty to be in the yard unless he had a call out.  *Id*.

When Corrections Officer John Exner ("Exner") found Petitioner in the main yard area outside the gate that led to the south mess hall, Petitioner was acting nervously, and his mess hall

whites were soaked in sweat.  *Id*. at 248-49.  According to Exner, there should not have been any

mess hall workers there.  *Id*.  Petitioner told Exner he was on PK pickup.  *Id*. at 249.  However,

PK pickup had already been completed.  *Id*.

### 5.    Identification of Petitioner as V.W.'s Attacker

Rebich and Schramm were asked by a Sergeant to go to the south mess hall to see if they

could identify the inmate who had attacked V.W.  (Dkt. No. 14-25 at 88.)  When they got to the

mess hall, Rebich saw V.W.'s attacker sitting at one of the tables.  *Id*. at 89.  Rebich recognized

him right away.  *Id*. at 90.  Rebich looked around to see if there was anyone else who might

resemble the inmate because he wanted to be sure, but no one else even came close.  *Id*.  When

they got back to where the inmate had been sitting, he had moved forward at least one row of

tables and at least two tables to the right.  *Id*.  The inmate was still wearing mess hall whites.  *Id*.

Rebich identified Petitioner as the attacker to the corrections officers in the mess hall and

identified him as V.W.'s attacker again at trial.  *Id*. at 91.

Schramm also identified Petitioner as the inmate who had attacked V.W.  (Dkt. No. 14-25

at 161.)  Schramm saw the attacker sitting at a table still wearing his white jacket and pants.  *Id*.

According to Schramm, he and the attacker made direct eye contact, and the attacker looked

nervous.  *Id*.  Schramm pointed him out to Rebich, and by the time he and Rebich returned to the

table where the attacker had been sitting, he had moved to another table between a couple of

inmates.  *Id*. at 162.  Schramm pointed Petitioner out to the Sergeant as the attacker and

identified Petitioner as the attacker at trial.  *Id*.

### 6.    Forensic Evidence

After being identified as V.W.'s attacker, Petitioner was examined by Auburn

Correctional Facility Registered Nurse Patrick Furnia ("Furnia"). (Dkt. No. 14-26 at 112, 116-120.) Furnia examined Petitioner's hands, arms, face and neck, upper torso, and legs. *Id*. at 117-18. Petitioner was found to have a lot of superficial injuries on his hands, arms, and upper arms. *Id*. at 118. The injuries included tiny nicks on his pinkies, scratches on his wrist, bruising on his right palm, and a superficial injury to his right bicep. *Id*. at 118. Furnia described the cuts, abrasions, and nicks as recent. *Id*. at 119.

John Stubbe ("Stubbe"), an experienced criminal scene investigator with the New York State Police, arrived at Auburn Correctional Facility at around 4:51pm the afternoon of the attack on V.W. to investigate the crime scene. (Dkt. No. 14-25 at 322-25.) Stubbe recovered a green towel, a white sock, an eyeglass lens and an arm to a set of glasses, a red pen, a roll of tape without the cardboard spindle, a torn ribbon to a sheet, and a broken watch from the corridor where V.W. had been attacked. *Id*. at 329-42, 351-362. Stubbe also found a pair of brown leather work gloves and a watch battery. *Id*. at 332, 353.

Forensic testing showed the presence of seminal fluid that matched Petitioner's DNA profile inside the palm area of both leather gloves and on the green towel found at the scene of the attack. (Dkt. No. 14-26 at 51-58, 63-64.) Petitioner was also a major contributor of DNA found on the sock, and blood on the heel of the sock matched the DNA of the victim V.W. *Id*. at 65.

Petitioner's single occupant cell in the Special Housing Unit was packed and frisked by corrections officers following the attack on V.W. (Dkt. No. 14-25 at 43, 436.) All of Petitioner's property was placed in draft bags and his property was brought to the administration building as directed by a facility captain. *Id*. at 436-37. The corrections officers were instructed

to look for any contraband in the cell.  *Id.* at 438.  Corrections officers found the cardboard

spindle from the role of tape found at the scene of the attack on V.W. in Petitioner's cell.  *Id*. at

363-64, 439-40.  The corrections officers also found that strips of Petitioner's bed sheet had been

torn away, and it was subsequently determined that the torn sheet had the same thread count and

cotton polyester blend as the strips of cloth found at the scene of the attack.  *Id.* at 365, 441, 508-

09.

     **C.**     **Defense Case**

Petitioner did not call any witnesses nor did he testify on his own behalf.  (Dkt. No. 14-26

at 235.)

**III.**     **STANDARD OF REVIEW**

     **A.**     **Exhaustion Requirement under the Antiterrorism and Effective Death
Penalty Act of 1996**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs

applications of incarcerated state court defendants seeking federal habeas corpus relief.  *See* 28

U.S.C. § 2254.  Before a federal court may consider an application for habeas corpus relief

pursuant to 28 U.S.C. § 2254, the petitioner must generally have exhausted all the remedies

available in the courts of the state in which he or she was convicted.  28 U.S.C. § 2254(b)(1)(A);

*see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) ("Section 2254(b) requires that prisoners

must ordinarily exhaust state remedies before filing for federal habeas relief."); *Jones v. Murphy*,

694 F.3d 225, 246-47 (2d Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 1247 (2013) ("Under

AEDPA, a prisoner in custody pursuant to a state court judgment must generally exhaust state

court remedies before seeking federal habeas corpus review.").

"Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011) (citation and internal quotation marks omitted); *Daye v. Attorney General of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*) (proper exhaustion requires that both the factual and legal premises of claim be "fairly presented" to the state court). Passage through the state courts, in and of itself, "is not sufficient." *Picard* [*v. Connor*, 404 U.S. 270, 275 (1971)]. To provide the State with the necessary 'opportunity,' the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Wilens v. Superintendent of Clinton Correc. Fac*., No. 11-CV-1938 (JFB), 2014 WL 28995, at *5, 2014 U.S. Dist. LEXIS 182111, at *13 (E.D.N.Y. Jan. 2 2014)[5] (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)) (internal quotation marks omitted).

Petitioner bears the burden of proving exhaustion. *Colon v. Johnson*, 19 F.Supp. 2d 112, 119-20 (S.D.N.Y. 1998) (citations omitted). Respondent has acknowledged Petitioner's exhaustion as to all of his habeas claims (Dkt. No. 13-1 at 26-27), and the Court agrees that the claims have been exhausted.

---

[5] Copies of unreported cases cited herein will be provided to Petitioner. *See Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**B.     Review of State Court Decisions on the Merits Under the AEDPA**

Under the AEDPA, an application for a writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated
> on the merits in State court proceedings unless the adjudication of
> the claim   (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States; or (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the evidence
> presented in the State court proceeding.

28 U.S.C. § 2254(d).  Recognizing the principle that "[s]tate courts are adequate forums for the

vindication of federal rights . . . , AEDPA erects a formidable barrier to federal habeas relief for

prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, ___U.S. ___, 134

S.Ct. 10, 15-16 (2013); *see also Cullen,* 563 U.S. at 181 ("This is a difficult to meet [ ] . . . and

highly deferential standard for evaluating state-court rulings, which demands that state-court

decisions be given the benefit of the doubt . . . .") (citation and internal quotation marks omitted).

"For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's

federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its

disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).  Under the

AEDPA, a summary disposition by a state court constitutes a disposition on the merits.

*Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Where AEDPA's deferential standard of review

applies, "[a] state court's determination of a factual issue is presumed to be correct, and may only

be rebutted by clear and convincing evidence." *Bierenbaum v. Graham*, 607 F.3d 36, 48 (2d Cir.

2010) (citing 28 U.S.C. § 2254(e)(1)), *cert. denied*, 131 S.Ct. 1693 (2011).  "[A] state court

factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 291 (2010).

In determining whether a state court has adjudicated a claim "on the merits," a federal habeas corpus court must classify the state court decision as either (1) fairly appearing to rest primarily on federal law or to be interwoven with federal law; or (2) fairly appearing to rest primarily on state procedural law. *Jimenez v. Walker*, 458 F.3d 130, 145 (2d Cir. 2006). Decisions in the first category are deemed to have been made "on the merits" of the federal claim. *Id*.

A decision "on the merits" is contrary to clearly established federal law when it is either contrary to Supreme Court precedent on a question of law or opposite to a relevant Supreme Court case with materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). "Section 2254(d)(1)'s 'clearly established' phrase refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decisions." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citation and internal quotation marks omitted). "[F]ederal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002). "[C]ircuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court . . . [and] cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, ___ U.S. ___, 132 S.Ct. 2148, 2155 (2012) (citation and internal quotation marks omitted).

A state court unreasonably applies federal law when it correctly identifies the governing legal rule in a particular case but applies the rule to the facts in an "objectively unreasonable"

manner. *Lockyer*, 538 U.S. at 75. An erroneous application of federal law is not necessarily an unreasonable one. *Williams,* 529 U.S. at 413. "Under § 2254(d)(1), 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond an possibility for fairminded disagreement.'" *White v. Wheeler*, ___ U.S. ___, ___ S.Ct. ___, No. 14-1372, 2015 WL 8546240, at \*2, 2015 U.S. LEXIS 7998, \* 5-6 (Dec. 14, 2015) (per curiam) (quoting *White v. Woodall*, ___ U.S. ___, 134 S.Ct. 1697, 1702 (2014), *see also Nevada v. Jackson*, ___ U.S. ___, 133 S.Ct. 1990, 1992 (2013) (per curiam) ("It is settled that a federal habeas corpus may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'") (quoting *Richter*, 562 U.S. at 101). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76.

Federal habeas corpus review is limited to determining whether petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. §§ 2241(c), 2254(a); *see also Wainwright v. Goode*, 464 U.S. 78, 83 (1983) ("[F]ederal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension."). Federal habeas relief does not "lie for errors of state law." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). Petitioner has the burden of proving by a preponderance of the evidence that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); *see also Smalls v. Batista*, 191 F.3d 272, 278 (2d Cir. 1999). "Section 2254(d) reflects

the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Richter*, 131 S.Ct. at 786. Where a claim has been adjudicated on the merits by a state court, federal habeas review is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen*, 131 S.Ct. at 1398.

## IV.     ANALYSIS

### A.     Trial Court's Denial of Petitioner's Request for a Adjournment of the Trial Date

Petitioner contends that the trial court's refusal to grant his December 3, 2007, request for an adjournment of his trial that was scheduled to begin that day violated his constitutional right to due process and the effective assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments. (Dkt. No. 1 at 5.) On remittitur from the Court of Appeals on Appeal No. 1, the Appellate Division, affirming Petitioner's conviction on the charges before it, noted that while Petitioner claimed that he had to represent himself at trial because his attorney had told him he was not prepared, his attorney had denied telling Petitioner he was not prepared. *People v. Clyde*, 935 N.Y.S.2d 795, 797 (4th Dep't 2011). The Court also focused on Petitioner's comment to Judge Wiggin's that District Attorney Vargason's term in office would expire in a few weeks, and he would not try the case on an adjourned date, and concluded that "'[w]here, as here, the defendant's request for an adjournment sought a tactical advantage, the court properly denied the request. *Id*.

It is "well established as a fundamental matter of due process that the defendant in a criminal case has the right to present a defense, that is, to present to the jury admissible evidence

that might influence the determination of guilt." *Grotto v. Herbert*, 316 F.3d 198, 205-06 (2d Cir. 2003). However, "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). A ruling on a request for an adjournment is "traditionally within the discretion of the trial judge." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *see also Grotto*, 316 F.3d at 206 ("The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel.") (quoting *Ungar*, 376 U.S. at 589).

The Supreme Court has recognized that trial judges bear the burden of "assembling the witnesses, lawyers, and jurors at the same place a the same time," and "this burden counsels against continuances except for compelling reasons." *Morris*, 461 U.S. at 11. "Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" violates due process." *Id*. at 11-12 (quoting *Ungar*, 376 U.S. at 589). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar*, 376 U.S. at 589; *see also Grotto*, 316 F.3d at 206.

Here, there was neither an arbitrary denial of Petitioner's request for an adjournment of the trial nor an unreasonable insistence on expeditiousness. Moreover, the circumstances

surrounding Petitioner's representation by appointed defense counsel Bates leading up to trial indicate that Petitioner was not prejudiced by the trial court's denial of his request for an adjournment.

Bates represented Petitioner from the time of his arraignment on March 20, 2007, until December 3, 2007, the day Petitioner's trial was scheduled to commence. (Dkt. No. 14-24 at 2, 132.) Following Petitioner's arraignment, Bates was aggressively engaged in Petitioner's defense and filed and appeared in court on a comprehensive omnibus motion, *id.* at 8-23; 14-27 at 59-65; received a bill of particulars from the prosecution, *id.* at 9; moved to dismiss the indictment (Dkt. No. 14-27 at 39-41); requested and appeared at a *Wade* hearing on Petitioner's behalf (Dkt. Nos. 14-24 at 25-96; 14-27 at 65); went to Vargason's office on more than one occasion to discuss the case, *id*. at 120-21; and appeared at a number of pre-trial conferences. (Dkt. No. 14-27 at 12-14.)

Although DOCCS failed to comply with Judge Wiggin's order and did not move Petitioner closer to Auburn until November 29, 2007, Bates still had three days to meet with Petitioner to prepare for trial. (Dkt. No. 14-24 at 119-120.) Significantly, Bates told Judge Wiggins that he had not told Petitioner, who was aware that Vargason's term as District Attorney was ending soon, that he was not prepared to go forward with the trial as Petitioner claimed.[6] (Dkt. No. 14-24 at 126.)

Furthermore, the trial had been scheduled to begin on December 3, 2007, since at least November 7, 2007, when Judge Wiggins issued the transfer order. (Dkt. No. 14-27 at 119-20.)

---

[6] Bates had, in fact, informed Judge Wiggins that he and Petitioner were ready for trial when they appeared at a pretrial conference on October 19, 2007. (Dkt. No. 14-24 at 101.)

The prospective jurors were already at the courthouse when Petitioner requested the adjournment. (Dkt. No. 14-24 at 111.)

In light of the foregoing, and given the broad discretion given trial court judges in ruling on adjournment requests, it is evident that the Fourth Department's affirmance of the trial court's denial of Petitioner's request for an adjournment was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Accordingly, the Court recommends that Petitioner's claim that his rights to due process and effective assistance of counsel were violated by the denial of his request for an adjournment be denied.

**B.      Trial Court's Handling of Petitioner's Decision to Proceed *Pro Se* at Trial**

Petitioner claims that his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments were violated by the trial court's failure to conduct a sufficiently searching inquiry before allowing him to proceed *pro se* at trial. On remittitur from the Court of Appeals on Appeal No. 1, the Appellate Division, affirming Petitioner's conviction on the charges before it, concluded that "[t]he record establishes that the court conducted an exceedingly thorough and searching inquiry to ensure that defendant's waiver of the right to be represented by counsel was knowing, voluntary and intelligent." *People v. Clyde*, 935 N.Y.S.2d 795, 797 (4th Dep't 2011).

"The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all 'critical stages' of the criminal process." *Iowa v. Tovar*, 541 U.S. 77, 87 (2004) (quoting *Maine v. Moulton*, 474 U.S. 159, 170 (1985)). The Sixth Amendment right to assistance of counsel also "embodies a correlative right to dispense with a lawyer's help." *Faretta v. California*, 422 U.S. 806, 814 (1975).

Clearly established Supreme Court precedent requires that before permitting a criminal defendant to proceed *pro se*, a court determine that the waiver of counsel is "knowing, voluntary and intelligent." *Tovar*, 541 U.S. at 88 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). The Supreme Court has described a waiver of counsel as intelligent when the defendant "knows what he is doing and his choice is made with eyes open." *Tovar*, 541 U.S. at 88 (citation and internal quotation marks omitted). The determination of whether there has been an intelligent waiver of rights depends on the circumstances of the case, "including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id.* at 88 (citing *Johnson*, 304 U.S. at 464).

The Supreme Court has not "prescribed any formula or script to read to a defendant who states that he elects to proceed without counsel." *Id*. However, before a defendant is permitted to proceed *pro se*, he must be "warned specifically of the hazards ahead," including the "dangers and disadvantages of self-representation[.]" *Id.* at 88-89.

Judge Wiggins questioned Petitioner regarding his education, physical and mental condition, his employment history and his understanding of the charges against him, function of the court and jury, and his experience. (Dkt. No. 14-24 at 134-40.) In addition, Judge Wiggins covered in exhaustive detail the dangers and disadvantages of self-representation and cautioned Petitioner against it, particularly in light of the availability of highly skilled counsel who had represented him throughout the case to defend him at trial. (*See* Dkt. No. 24-14 at 132-50.) Judge Wiggins gave Petitioner an opportunity to discuss the issue of self-representation with Bates both before and after he had advised him of the significant pitfalls of self-representation. *Id*. at 133, 150. Petitioner nonetheless decided to waive counsel and proceed to trial *pro se. Id*.

34

at 151; Dkt. No. 14-27 at 121. While allowing Petitioner to proceed *pro se*, the trial court

mandated that Bates be available through trial if Petitioner needed his advice. (Dkt. No, 24-14 at

143.)

The Court agrees with the Appellate Division finding that the trial court conducted "an

exceedingly thorough and searching inquiry" to determine whether Petitioner's waiver of counsel

was knowing, voluntary and intelligent, *People v. Clyde*, 935 N.Y.S.2d at 979, and also finds that

the trial court did a very thorough job of advising Petitioner of the dangers and disadvantages of

representing himself at trial. Therefore, the Court finds that the Appellate Division decision on

the issue of Petitioner's self-representation was not contrary to or an unreasonable application of

clearly established Supreme Court precedent and recommends that Petitioner's claim be denied.

### C.     Shackling of Petitioner at Trial

Petitioner claims that the trial court violated his constitutional rights under the Fifth,

Sixth, and Fourteenth Amendments by requiring him to be shackled in leg irons throughout the

trial. (Dkt. No. 1 at 8.) The Appellate Division agreed in Appeal No. 1, with one dissent, and

ordered that the judgment of conviction on the charges before it be reversed because of the trial

court's failure to articulate a reasonable basis on the record for requiring Petitioner to be

restrained in shackles. *People v. Clyde*, 899 N.Y.S.2d 757 (4th Dep't 2010). The Court of

Appeals, in a 4-3 decision, reversed the Appellate Division determination on the shackling on

harmless error grounds. *People v. Clyde*, 938 N.Y.S.2d 243, 250 (2011).

In *Deck v. Missouri*, 544 U.S. 622, 629 (2005), *abrogated on other grounds, Fry v. Pliler*,

551 U.S. 112 (2007), the Supreme Court concluded that "the Fifth and Fourteenth Amendments

prohibit the use of physical restraints visible to the jury absent a trial court determination, in the

exercise of its discretion, that they are justified by a state interest specific to a particular trial."[7] In *Deck*, 544 U.S. at 631, the Supreme Court identified the three fundamental legal principles underlying its determination on shackling as the presumption of innocence, which is undermined by shackling; the right to secure a meaningful defense, which is diminished by physical restraints that interfere with an accused's ability to confer with counsel and ability to participate in his own defense; and maintenance of a dignified judicial process. *Deck*, 544 U.S. at 630-32.

The Supreme Court recognized in *Deck* that there will be instances where shackling at trial is unavoidable, and noted that "[w]e do not underestimate the need to restrain dangerous defendants to prevent courtroom attacks, or the need to give trial courts latitude in making individualized security determinations." *Deck*, 544 U.S. at 632. However, the Court made it clear that the trial court must justify the use of visible shackles by a case specific security determination reflecting particular concerns such as special security needs or escape risks, with individualized findings on the record. *Id*. at 633.

There is nothing in the state court record setting forth Judge Wiggin's rationale for requiring Petitioner to be shackled at trial. "Where a court, without adequate justification [articulated on the record], orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." *Deck*, 544 U.S. at 635. Thus, the Court of Appeals correctly found that requiring Petitioner to be shackled

---

[7] The Supreme Court noted in *Deck* that "visible shackling undermines the presumption of innocence and the related fairness of the factfinding process . . . and suggests to the jury that the justice system itself sees a need to separate a defendant from the community at large." *Deck*, 544 U.S. at 630 (citation and internal quotation marks omitted).

in a manner visible to the jury during trial without an adequate justification appearing on the record constituted a violation of his right to due process. *People v. Clyde*, 938 N.Y.S.2d at 248.

However, a *Deck* error is not grounds for reversal if it did not affect the verdict because as the Supreme Court confirmed in *Deck*, the harmless error analysis applies to the use of physical restraints on a criminal defendant at trial. *Deck*, 544 U.S. at 635. A habeas court assessing the prejudicial impact of a constitutional error in a state court trial must apply the harmless error standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (constitutional error requires reversal only if it "had [a] substantial and injurious effect or influence in determining the jury's verdict."). *See Fry,* 551 U.S. at 121-22 (in habeas proceedings under the AEDPA, "a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht, supra*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the harmless beyond a reasonable doubt standard set forth in *Chapman [v. California*, 386 U.S. 18, 24 (1967)].") (internal quotation marks omitted).

The Court of Appeals held that the harmless error analysis was applicable. *People v. Clyde*, 938 N.Y.S.2d at 244-45. However, the Court recited the requirement set forth in *Chapman* and followed in *Deck* that the State prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained," and concluded that the Court's job was to "decide whether the proof of Clyde's guilt was overwhelming and whether there [was] no reasonable possibility that the jury would have acquitted him were it not for the shackling error." *Id.* at 247 (citing *Deck*, 544 U.S. at 635). The majority concluded that considering the DNA evidence, the identification testimony, and evidence that items found at the

scene of the attack matched items in Petitioner's cell, the evidence of guilt was overwhelming and there was no reasonable possibility of acquittal by the jury had Petitioner not worn shackles. *Id*. at 248.

This Court likewise concludes that the evidence of Petitioner's guilt was overwhelming and acquittal not a reasonable possibility absent the shackles, and applying "the substantial and injurious effect" in *Brecht*, as it is required to do, finds that the trial court's failure to articulate its reasons for requiring shackling on the record was harmless error.[8]  Therefore, the Court recommends that Petitioner's shackling claim be denied.

### D.    Legal Insufficiency of the Evidence on the Attempted Rape in the First Degree Charge

Petitioner claims that his conviction on attempted rape in the first degree was based upon legally insufficient evidence and properly dismissed by Judge Wiggins despite the jury's finding of guilt.  (Dkt. Nos. 1 at 9; 14-26 at 453-56, 481-82, 493-94.)  The Appellate Division affirmed

---

[8]  The three judge dissent in *People v. Clyde*, 938 N.Y.S.2d 243, 250-52 (2011) also applied the *Chapman* beyond a reasonable doubt standard for harmless error rather than the substantial and injurious effect standard in *Brecht* and concluded that although the evidence was overwhelming as to some of the charges, it was not overwhelming with respect to the attempted rape in the first degree charge reinstated by the majority.  *Id*. at 250.  This Court finds that even if the evidence on the attempted rape charge was arguably less "overwhelming" than on the other charges, considering the totality of the evidence at trial on all of the charges, the shackling did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*,  507 U.S. at 638.  Furthermore, it had to have been obvious to the jury from the evidence at trial that Petitioner was incarcerated in the DOCCS system at the time of the crimes for which he was on trial, and the jurors could as likely as not have assumed his incarceration was the reason for the shackling.  *See Walker v. Martel*, 709 F.3d 925, 942 (9th Cir. 2013) (although jury became aware of knee restraint on defendant's leg under his clothing during trial, "it only suggested [his] custody status, not a proclivity for violence, as his hands were unencumbered.")

the dismissal in Appeal No. 2., *People v. Clyde*, 899 N.Y.S.2d 757 (4th Dep't 2010), and the

Court of Appeals reinstated the conviction.[9] *People v. Clyde*, 938 N.Y.S.2d 243 (2011).

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court made it clear "that it is

the responsibility of the jury — not the court — to decide what conclusions should be drawn from

the evidence admitted at trial." *Cavazos v. Smith*, ___ U.S. ___, 132 S.Ct. 2, 4 (2011). A

reviewing court may set aside a jury's verdict on the ground of insufficient evidence only "if it is

found that upon the record evidence adduced at trial no rational trier of fact could have found

proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324; *see also Hoffler v. Bezio*,

726 F.3d 144, 162 (2d Cir. 2013) ("A defendant challenging the sufficiency of the evidence

bears a heavy burden because . . . [the court] must view the evidence in the light most favorable

to the prosecution, and doing so, must uphold the jury verdict as long as '*any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt.'") (quoting

*Jackson*, 443 U.S. at 319) (emphasis in original).

Furthermore, "a federal court may not overturn a state court decision rejecting a

sufficiency of the evidence challenge simply because the federal court disagrees with the state

court. The federal court instead may do so only if the state court decision was 'objectively

unreasonable.'" *Cavazos*, 132 S.Ct. at 4 (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010))

(internal quotation marks omitted).

Under *Jackson*, a habeas court is required to first look to state law for the substantive

elements of the crime at issue. *Jackson*, 443 U.S. at 324 n.16. Penal Law §130.35(1) provides in

---

[9] The dissent in *People v. Clyde*, 938 N.Y.S.2d 243 (2011) was limited to the shackling
issue.

relevant part that "A person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person: 1. By forcible compulsion." Penal Law § 110.00 provides that "A person is guilty of an attempt to commit a crime when, with the intent to commit a crime, he engages in conduct which tends to effect the commission of a crime." Under Penal Law § 110.00, the accused's "conduct must have passed the state of mere intent or mere preparation to commit a crime," and the accused must have "engaged in conduct that came 'dangerously near' commission of the completed crime." *People v. Naradzay*, 872 N.Y.S.2d 373, 377 (2008) (citations and internal quotation marks omitted). "The 'dangerously near' standard does not, however, mandate that the defendant take 'the final step necessary' to complete the offense." *Id*. (citing *People v. Mahboubian*, 544 N.Y.S.2d 769, 777 (1989)). "[T]he boundary where preparation ripens into punishable conduct depends greatly on the facts of the particular case." *Mahboubian*, 544 N.Y.S.2d at 777.

As noted above, the Supreme Court has made it clear that it is the jury rather than the court that is responsible for deciding what conclusions should be drawn from the evidence. *See Cavazos,* 132 S.Ct. at 4 (citing *Jackson,* 443 U.S. 307). In this case the jury found Petitioner guilty on the attempted rape in the first degree charge. (Dkt. No. 14-26 at 453-56.) The majority in the Court of Appeals concluded that a "rational jury could have concluded that the attack was carried forward to a point that came within dangerous proximity to forcible sexual intercourse." *People v. Clyde*, 938 N.Y.S.2d at 249. The Court of Appeals based its determination regarding sufficiency of the evidence on testimony that Petitioner was lurking in an alleyway that civilian employees walked often along; he attacked a female victim in a corridor that was otherwise empty; he brought items that could silence and restrain a person; he tried to incapacitate V.W.; he

40

did not ask V.W. to help him escape or direct her to do anything other than be quiet; he forced V.W. to the floor and straddled her; he was in the process of binding her hands when Rebich appeared; and evidence was presented from which the jury could infer that he ejaculated before fleeing the scene. *Id*.

This Court notes that Petitioner not only brought items that could be used to silence V.W., he actually forced either the sock or towel found at the scene into V.W.'s mouth to silence her, presumably to keep her from screaming for assistance. (Dkt. No. 14-26 at 189-90.) In addition, the Court notes that V.W. testified that she had the keys to both the truck she had been driving and the storehouse in her pocket, and there is no evidence suggesting that Petitioner attempted to take the keys to aid in an escape attempt. *Id*. at 181-82, 209.

The evidence of attempted rape would presumably have been stronger had Petitioner removed some of V.W.'s clothing, put his hands under her clothing, or groped her before Rebich appeared. *Id*. at 198. Even though he did not, given the trial evidence discussed above, this Court cannot conclude that a rational jury could not have determined that the attack was carried forward to a point that came within dangerous proximity to forcible sexual intercourse. Therefore, the Court finds that the Court of Appeals' reinstatement of the jury's finding of guilt on the charge of attempted rape in the first degree was not contrary to or an unreasonable application of clearly established Supreme Court precedent and recommends that Petitioner's claim be denied.

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the Petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED** and **DISMISSED**. The Court finds that Petitioner has not made a "substantial

showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) (2006) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).  Therefore, the Court recommends that no certificate of appealability issue with respect to any of Petitioner's claims; and it is hereby

**ORDERED**, that the Clerk's Office provide Petitioner with copies of all unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


Dated: December 22, 2015
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2015 WL 8546240
Only the Westlaw citation is currently available.
Supreme Court of the United States

Randy WHITE, Warden

v.

Roger L. WHEELER.

No. 14–1372.   |   Dec. 14, 2015.

**Synopsis**

**Background:** Following affirmance of state prisoner's capital conviction and death sentence, 121 S.W.3d 173, and affirmance of denial of state post-conviction relief, 2008 WL 5051579, prisoner sought federal habeas relief. The United States District Court for the Western District of Kentucky, Joseph H. McKinley, Jr., Chief Judge, denied relief. Prisoner appealed. The United States Court of Appeals for the Sixth Circuit, Merritt, Circuit Judge, 779 F.3d 366, affirmed the conviction, reversed the death sentence, and remanded.

**[Holding:]** Upon granting certiorari, the Supreme Court held that state court's determination, to excuse for cause a prospective juror on grounds of substantial impairment of ability to impose death penalty, was entitled to deference on federal habeas review.

Certiorari granted; Court of Appeals reversed.

West Headnotes (11)

**[1]**    **Habeas Corpus**
    Federal Review of State or Territorial Cases

The Antiterrorism and Effective Death Penalty Act (AEDPA), by setting forth necessary predicates before state-court judgments may be set aside, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. 28 U.S.C.A. § 2254(d).

Cases that cite this headnote

**[2]**    **Habeas Corpus**

    Federal Review of State or Territorial Cases

For a state prisoner to establish that a state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, as basis for federal habeas relief, the state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. 28 U.S.C.A. § 2254(d)(1).

Cases that cite this headnote

**[3]**    **Jury**
    Punishment Prescribed for Offense

While the Sixth Amendment's guarantee of an impartial jury confers on capital defendants the right to a jury not uncommonly willing to condemn a man to die, the states have a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes, and to ensure the proper balance between these two interests, only a prospective juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause. U.S.C.A. Const.Amend. 6.

Cases that cite this headnote

**[4]**    **Jury**
    Punishment Prescribed for Offense

A prospective juror may be excused for cause in a capital case where the trial judge is left with the definite impression that the prospective juror would be unable to faithfully and impartially apply the law.

Cases that cite this headnote

**[5]**    **Criminal Law**
    Summoning, Impaneling, or Selection of Jury

**Jury**
    Punishment Prescribed for Offense

Reviewing courts owe deference to a trial court's ruling on whether to strike a particular prospective juror in a capital case, regardless of whether the trial court engages in explicit analysis regarding substantial impairment of the ability to impose the death penalty under the state-law framework; even the granting of a motion to excuse for cause constitutes an implicit finding of bias.

Cases that cite this headnote

**[6]     Criminal Law**
    👈 Summoning, Impaneling, or Selection of Jury

A trial court's finding in a capital case that there is a substantial impairment of the ability of a prospective juror to impose the death penalty under the state-law framework may be upheld on review even in the absence of clear statements from the prospective juror that he or she is impaired.

Cases that cite this headnote

**[7]     Habeas Corpus**
    👈 Jury

**Habeas Corpus**
    👈 Particular Issues and Problems

Where a federal habeas court reviews, under the constraints of the Antiterrorism and Effective Death Penalty Act (AEDPA), a state-court ruling on whether to strike a prospective juror in a capital case on grounds of substantial impairment of the ability to impose the death penalty under the state-law framework, the federal court must accord an additional and independent, high standard of deference, and as a result, federal habeas review must be doubly deferential. 28 U.S.C.A. § 2254(d)(1).

Cases that cite this headnote

**[8]     Habeas Corpus**
    👈 Jury

State court's determination, to excuse for cause a prospective juror in capital case on grounds of substantial impairment of ability to impose death

penalty, was entitled to deference on federal habeas review; prospective juror's answers during voir dire, including expression of lack of absolute certainty that he could realistically consider death penalty, were at least ambiguous, and a fairminded jurist could readily conclude that trial judge's exchange with prospective juror reflected diligent and thoughtful voir dire, that trial judge considered with care prospective juror's statements during voir dire, and that trial judge was fair in exercising her broad discretion in determining whether prospective juror was qualified to serve in a capital case. 28 U.S.C.A. § 2254(d)(1).

Cases that cite this headnote

**[9]     Jury**
    👈 Punishment Prescribed for Offense

When there is ambiguity as to a prospective juror's statements regarding his or her ability to impose the death penalty in a capital case, the trial court is entitled to resolve it in favor of the State.

Cases that cite this headnote

**[10]     Criminal Law**
    👈 Summoning, Impaneling, or Selection of Jury

**Jury**
    👈 Punishment Prescribed for Offense

The substantial deference owed to a trial court's contemporaneous assessment of a juror's demeanor, and its bearing on how to interpret or understand the juror's responses regarding his or her ability to impose the death penalty in a capital case, is likewise owed when made by the trial court after a careful review of a formal transcript or recording; if the trial judge chooses to reflect and deliberate further, that is not to be faulted, but rather is to be commended.

Cases that cite this headnote

**[11]     Habeas Corpus**
    👈 Federal Review of State or Territorial Cases

The provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply with full force even when reviewing a conviction and sentence imposing the death penalty. 28 U.S.C.A. § 2254(d).

Cases that cite this headnote

**Opinion**

PER CURIAM.

*1 A death sentence imposed by a Kentucky trial court and affirmed by the Kentucky Supreme Court has been overturned, on habeas corpus review, by the Court of Appeals for the Sixth Circuit. During the jury selection process, the state trial court excused a juror after concluding he could not give sufficient assurance of neutrality or impartiality in considering whether the death penalty should be imposed. The Court of Appeals, despite the substantial deference it must accord to state-court rulings in federal habeas proceedings, determined that excusing the juror in the circumstances of this case violated the Sixth and Fourteenth Amendments. That ruling contravenes controlling precedents from this Court, and it is now necessary to reverse the Court of Appeals by this summary disposition.

Warden Randy White is the petitioner here, and the convicted prisoner, Roger Wheeler, is the respondent.

In October 1997, police in Louisville, Kentucky, found the bodies of Nigel Malone and Nairobi Warfield in the apartment the couple shared. Malone had been stabbed nine times. Warfield had been strangled to death and a pair of scissors stuck out from her neck. She was pregnant. DNA taken from blood at the crime scene matched respondent's. Respondent was charged with the murders.

During *voir dire,* Juror 638 gave equivocal and inconsistent answers when questioned about whether he could consider voting to impose the death penalty. In response to the judge's questions about his personal beliefs on the death penalty, Juror 638 said, "I'm not sure that I have formed an opinion one way or the other. I believe there are arguments on both sides of the—of it." App. to Pet. for Cert. 126a. When asked by the prosecution about his ability to consider all available penalties, Juror 638 noted he had "never been confronted with that situation in a, in a real-life sense of having to make that

kind of determination." *Id.,* at 131a. "So it's difficult for me," he explained, "to judge how I would I guess act, uh." *Ibid.* The prosecution sought to clarify Juror 638's answer, asking if the juror meant he was "not absolutely certain whether [he] could realistically consider" the death penalty. *Id.,* at 132a. Juror 638 replied, "I think that would be the most accurate way I could answer your question." *Ibid.* During defense counsel's examination, Juror 638 described himself as "a bit more contemplative on the issue of taking a life and, uh, whether or not we have the right to take that life." *Id.,* at 133a. Later, however, he expressed his belief that he could consider all the penalty options. *Id.,* at 134a.

The prosecution moved to strike Juror 638 for cause based on his inconsistent replies, as illustrated by his statement that he was not absolutely certain he could realistically consider the death penalty. The defense opposed the motion, arguing that Juror 638's answers indicated his ability to consider all the penalty options, despite having some reservations about the death penalty. The judge said that when she was done questioning Juror 638, she wrote in her notes that the juror " 'could consider [the] entire range' " of penalties. *Id.,* at 138a. She further stated that she did not "see him as problematic" at the end of her examination. *Ibid.* But she also noted that she did not "hear him say that he couldn't realistically consider the death penalty," and reserved ruling on the motion until she could review Juror 638's testimony. *Ibid.* The next day, after reviewing the relevant testimony, the judge struck Juror 638 for cause. When she announced her decision to excuse the juror, the trial judge stated, "And when I went back and reviewed [the juror's] entire testimony, [the prosecution] concluded with saying, 'Would it be accurate to say that you couldn't, couldn't consider the entire range?' And his response is—I think was, 'I think that would be pretty accurate.' So, I'm going to sustain that one, too." *Id.,* at 139a–140a.

The case proceeded to trial. Respondent was convicted of both murders and sentenced to death. The Kentucky Supreme Court affirmed the convictions and the sentence. *Wheeler v. Commonwealth,* 121 S.W.3d 173, 189 (2003). In considering respondent's challenges to the trial court's excusal of certain jurors for cause, the Kentucky Supreme Court held that the trial judge "appropriately struck for cause those jurors that could not impose the death penalty.... There was no error and the rights of the defendant to a fair trial by a fair and impartial jury ... under both the federal and state constitutions were not violated." *Id.,* at 179.

**\*2** After exhausting available state postconviction procedures, respondent sought a writ of habeas corpus under 28 U.S.C. § 2254 from the United States District Court for the Western District of Kentucky. He asserted, *inter alia,* that the Kentucky trial court erred in striking Juror 638 during *voir dire* on the ground that the juror could not give assurances that he could consider the death penalty as a sentencing option. The District Court dismissed the petition; but a divided panel of the Court of Appeals for the Sixth Circuit reversed, granting habeas relief as to respondent's sentence. *Wheeler v. Simpson,* 779 F.3d 366, 379 (2015). While acknowledging the deferential standard required on federal habeas review of a state conviction, the Court of Appeals held that allowing the exclusion of Juror 638 was an unreasonable application of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and their progeny. 779 F.3d, at 372–374.

**[1] [2]** Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), habeas relief is authorized if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This Court, time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 571 U.S. ——, ——, 134 S.Ct. 10, 16, 187 L.Ed.2d 348 (2013). Under § 2254(d)(1), " 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' "*White v. Woodall,* 572 U.S. ——, ——, 134 S.Ct. 1697, 1702, 188 L.Ed.2d 698 (2014) (quoting *Harrington v. Richter,* 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)).

**[3] [4]** The Court of Appeals was required to apply this deferential standard to the state court's analysis of respondent's juror exclusion claim. In *Witherspoon,* this Court set forth the rule for juror disqualification in capital cases. *Witherspoon* recognized that the Sixth Amendment's guarantee of an impartial jury confers on capital defendants the right to a jury not "uncommonly willing to condemn a man to die." 391 U.S., at 521, 88 S.Ct. 1770. But the Court with equal clarity has acknowledged the State's "strong interest in having jurors who are able to apply capital punishment

within the framework state law prescribes."*Uttecht v. Brown,* 551 U.S. 1, 9, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007). To ensure the proper balance between these two interests, only "a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause."*Ibid.* As the Court explained in *Witt,* a juror may be excused for cause "where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." 469 U.S., at 425–426, 105 S.Ct. 844.

**\*3 [5] [6] [7]** Reviewing courts owe deference to a trial court's ruling on whether to strike a particular juror "regardless of whether the trial court engages in explicit analysis regarding substantial impairment; even the granting of a motion to excuse for cause constitutes an implicit finding of bias."*Uttecht,* 551 U.S., at 7, 127 S.Ct. 2218. A trial court's "finding may be upheld even in the absence of clear statements from the juror that he or she is impaired...."*Ibid.* And where, as here, the federal courts review a state-court ruling under the constraints imposed by AEDPA, the federal court must accord an additional and "independent, high standard" of deference. *Id.,* at 10, 127 S.Ct. 2218. As a result, federal habeas review of a *Witherspoon–Witt* claim—much like federal habeas review of an ineffective-assistance-of-counsel claim—must be " ' 'doubly deferential.' ' " *Burt, supra,* at ——, 134 S.Ct., at 13 (quoting *Cullen v. Pinholster,* 563 U.S. 170, 190, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011)).

The Court of Appeals held that the Kentucky Supreme Court unreasonably applied *Witherspoon, Witt,* and their progeny when it determined that removing Juror 638 for cause was constitutional. 779 F.3d, at 372–374. The Court of Appeals determined that Juror 638 "understood the decisions he would face and engaged with them in a thoughtful, honest, and conscientious manner."*Id.,* at 373. In the Court of Appeals' estimation, the trial judge concluded the juror was not qualified only by "misapprehending a single question and answer exchange" between Juror 638 and the prosecution, *id.,* at 374—the exchange in which Juror 638 stated he was not absolutely certain he could realistically consider the death penalty, *id.,* at 372. According to the Court of Appeals, Juror 638 "agreed *he did not know* to an absolute certainty whether he could realistically consider the death penalty, but the court proceeded as if *he knew he could not.*"*Ibid.* The Court of Appeals further determined that if the trial judge, when reviewing Juror 638's examination, had "properly processed

that exchange" between Juror 638 and the prosecution, Juror 638 would not have been excused. *Id., at 374.*

Both the analysis and the conclusion in the decision under review were incorrect. While the Court of Appeals acknowledged that deference was required under AEDPA, it failed to ask the critical question: Was the Kentucky Supreme Court's decision to affirm the excusal of Juror 638 for cause " 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement' "?*Woodall, supra, at ——, 134 S.Ct., at 1702* (quoting *Harrington, supra, at 103, 131 S.Ct. 770*).

**\*4** **[8]** **[9]** The Court of Appeals did not properly apply the deference it was required to accord the state-court ruling. A fairminded jurist could readily conclude that the trial judge's exchange with Juror 638 reflected a "diligent and thoughtful *voir dire*"; that she considered with care the juror's testimony; and that she was fair in the exercise of her "broad discretion" in determining whether the juror was qualified to serve in this capital case. *Uttecht, 551 U.S., at 20, 127 S.Ct. 2218.* Juror 638's answers during *voir dire* were at least ambiguous as to whether he would be able to give appropriate consideration to imposing the death penalty. And as this Court made clear in *Uttecht,* "when there is ambiguity in the prospective juror's statements," the trial court is " 'entitled to resolve it in favor of the State.'"*Id., at 7, 127 S.Ct. 2218* (quoting *Witt, supra, at 434, 105 S.Ct. 844*).

The Court of Appeals erred in its assessment of the trial judge's reformulation of an important part of Juror 638's questioning. *779 F.3d, at 372.* When excusing the juror the day after the *voir dire,* the trial judge said that the prosecution had asked whether the juror "couldn't consider the entire range" of penalties. App. to Pet. for Cert. 139a. The prosecution in fact asked if the juror was "not absolutely certain whether [he] could realistically consider" the entire range of penalties. *Id., at 132a.* The juror's confirmation that he was "not absolutely certain whether [he] could realistically consider" the death penalty, *ibid.,* was a reasonable basis for the trial judge to conclude that the juror was unable to give that penalty fair consideration. The trial judge's decision to excuse Juror 638 did not violate clearly established federal law by concluding that Juror 638 was not qualified to serve as a member of this capital jury. See *Witt, supra, at 424–426, 105 S.Ct. 844.* And similarly, the Kentucky Supreme Court's ruling that there was no error is not beyond any possibility for fairminded disagreement.

The Court of Appeals noted that the deference toward trial courts recognized in *Uttecht*"was largely premised on the trial judge's ability to 'observe the demeanor of' " the juror. *779 F.3d, at 373* (quoting *551 U.S., at 17, 127 S.Ct. 2218*). It concluded that deference to the trial court here supported habeas relief, because the trial judge's "initial assessment of [the juror's] answers and demeanor" did not lead her to immediately strike Juror 638 for cause. *779 F.3d, at 373–374.*

**[10]** The Court of Appeals' conclusion conflicts with the meaning and holding of *Uttecht* and with a common-sense understanding of the jury selection process. Nothing in *Uttecht* limits the trial court to evaluating demeanor alone and not the substance of a juror's response. And the implicit suggestion that a trial judge is entitled to less deference for having deliberated after her initial ruling is wrong. In the ordinary case the conclusion should be quite the opposite. It is true that a trial court's contemporaneous assessment of a juror's demeanor, and its bearing on how to interpret or understand the juror's responses, are entitled to substantial deference; but a trial court ruling is likewise entitled to deference when made after a careful review of a formal transcript or recording. If the trial judge chooses to reflect and deliberate further, as this trial judge did after the proceedings recessed for the day, that is not to be faulted; it is to be commended.

**\*5** This is not a case where "the record discloses no basis for a finding of substantial impairment."*Uttecht, supra, at 20, 127 S.Ct. 2218.*The two federal judges in the majority below might have reached a different conclusion had they been presiding over this *voir dire.* But simple disagreement does not overcome the two layers of deference owed by a federal habeas court in this context.

3

The Kentucky Supreme Court was not unreasonable in its application of clearly established federal law when it concluded that the exclusion of Juror 638 did not violate the Sixth Amendment. Given this conclusion, there is no need to consider petitioner's further contention that, if there were an error by the trial court in excluding the juror, it should be subject to harmless-error analysis. And this Court does not review the other rulings of the Court of Appeals that are not addressed in this opinion.

**[11]**    As a final matter, this Court again advises the Court of Appeals that the provisions of AEDPA apply with full force even when reviewing a conviction and sentence imposing the death penalty. See, *e.g.,* *Parker v. Matthews,* 567 U.S. ——, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012) (*per curiam* ); *Bobby v. Dixon,* 565 U.S. ——, 132 S.Ct. 26, 181 L.Ed.2d 328 (2011) (*per curiam* ); *Bobby v. Mitts,* 563 U.S. 395, 131 S.Ct. 1762, 179 L.Ed.2d 819 (2011) (*per curiam* ); *Bobby v. Van Hook,* 558 U.S. 4, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (*per curiam* ).

The petition for certiorari and respondent's motion to proceed *in forma pauperis* are granted. The judgment of the Court of Appeals for the Sixth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**All Citations**

--- S.Ct. ----, 2015 WL 8546240

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 28995
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Randy WILENS, Petitioner,
v.
SUPERINTENDENT OF CLINTON
CORRECTIONAL FACILITY, Respondent.

No. 11–CV–1938 (JFB).  |  Dec. 31, 2013.

**Attorneys and Law Firms**

Randy Wilens, pro se.

Thomas Spota, District Attorney of Suffolk County, by Michael Herman Blakey, Riverhead, NY, for Respondent.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

**\*1** Randy Wilens ("Petitioner") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his October 25, 2005 conviction in state court. Under Suffolk County Indictment Number 1020–2005, Petitioner was charged with two counts of Course of Sexual Conduct Against a Child in the First Degree (N.Y. Penal Law § 130.75(1)(a)), two counts of Course of Sexual Conduct Against a Child in the Second Degree (N.Y. Penal Law § 130.80(1)(a)), three counts of Sexual Abuse in the First Degree (N.Y. Penal Law § 130.65(3)), and five counts of Endangering the Welfare of a Child (N .Y. Penal Law § 260.10(1)). Petitioner pled guilty to the indictment and was sentenced, as a prior felony offender, to an aggregate term of fourteen years' incarceration with five years post-release supervision ("PRS").

Petitioner now challenges his conviction, arguing that: (1) his Fourteenth Amendment due process rights were violated because he was not informed of the mandatory post-release supervision ("PRS") as a component of his sentence; (2) he received ineffective assistance of counsel when his attorney failed to advise him of PRS accompanying the sentence, failed to object to duplicate counts in the indictment, and failed to file an appeal; (3) his allocution was insufficient to support a conviction for the crimes alleged; and (4) the

District Attorney committed *Brady* and *Rosario* violations by failing to disclose Family Court findings and medical reports related to the case.

For the reasons set forth herein, the Court finds that Petitioner has not demonstrated any basis for habeas relief. Most of Petitioner's claims are procedurally barred. In any event, all of Petitioner's claims fail on the merits. The Court, therefore, denies the petition in its entirety.

## I. BACKGROUND

### A. Facts

#### 1. The Plea

On August 30, 2005, Petitioner entered a plea before the Honorable Michael Mullen. Under advice of counsel, Petitioner was sworn in (P. 4), [1] and affirmed that he freely entered his guilty plea while waiving his constitutional and statutory trial rights. (P. 5–6.) Petitioner allocuted to his guilt on the offenses charged, admitting that: (1) at least three times within a three month period between 2002 and 2004, he subjected a female child, who was less than eleven years of age, to sexual contact and sexual intercourse for his sexual gratification (*id.* at 7–8); (2) between September 2003 and July 2004, on three occasions within a three month period, at his residence in Suffolk County, he had sexual contact with a male child, who was less than eleven years of age, including one incident of oral sexual conduct (*id.* at 9–10); (3) at his residence in Suffolk County, in July 2004, he had sexual intercourse with a male, who was less than eleven years of age, for his own sexual gratification (*id.* at 11–12); (4) he had sexual contact with another male who was less than eleven years of age for his own sexual gratification (*id.* at 12–13); (5) he twice exposed himself to a female less than seventeen years of age (*id.* at 15–16); (6) in October 2004, at a house in Suffolk County, he had sexual contact with a female, who was under eleven years of age, for his own sexual gratification (*id.* at 13–14); (7) at a house in Suffolk County, in the autumn of 2004, he played pornographic video tapes for a minor under eleven years of age (*id* . at 14); (8) in the autumn of 2004, he displayed lewd images from his cell phone to a child under seventeen years of age (*id.* at 14–15); and (9) he endangered the physical, mental, and moral welfare of four children under seventeen years of age (*id.* at 16).

**\*2** The court was satisfied with the allocution and Petitioner was found guilty of all charges which consisted of: (1) two

counts of Course of Sexual Conduct Against a Child in the First Degree (N.Y. Penal Law § 130.75(1)(a)); (2) two counts of Course of Sexual Conduct Against a Child in the Second Degree (N.Y. Penal Law § 130.80(1)(a)); (3) three counts of Sexual Abuse in the First Degree (N.Y. Penal Law § 130.65(3)); and (4) five counts of Endangering the Welfare of a Child (N.Y. Penal Law § 260.10(1)). (P. 16–17.)

**2. The Sentencing**

At the sentencing hearing on October 25, 2005, Petitioner was sentenced as a Persistent Felony Offender ("P.F.O.") after admitting to a prior conviction of Sodomy in the First Degree, a class "B" felony. (S.5–6.)[2] The court sentenced Petitioner as follows: (1) for two counts of Course of Sexual Conduct Against a Child in the Second Degree, Petitioner was sentenced to two concurrent terms of seven-years' incarceration with three-years' PRS (*id.* at 9–10); (2) for two counts of Course of Sexual Conduct Against a Child in the First Degree, Petitioner was sentenced to two concurrent terms of fourteen-years' incarceration with five-years' PRS (*id.* at 10); (3) for three counts of Sexual Abuse in the First Degree, the court sentenced Petitioner to three concurrent terms of seven-years incarceration with three-years' PRS (*id.* at 10); and (4) for five counts of Endangering the Welfare of a Child, the court sentenced Petitioner to five concurrent terms of one year of incarceration.(*Id.* at 10–11.)All terms of the sentence were ordered to run concurrently.

**B. Procedural History**

Petitioner filed a notice of motion for sentence reduction on November 17, 2005. His court appointed defense counsel argued that, in the interest of justice, the sentence should be reduced from 14 years, to the minimum 10 years, as the imposed sentence was harsh and excessive. (Notice of Motion for Sentence Reduction, Dec. 31, 2007, Indictment Number 1020–2005.) Petitioner also wrote a letter to the Appellate Division seeking permission to file a *pro se* supplemental brief. The Appellate Division granted the request. Through his Supplemental Brief filed October 30, 2007, Petitioner claimed that his sentence was harsh and excessive and should be reduced because (1) his plea was unknowingly made, as he was not made aware of post-release supervision accompanying the plea, and (2) his counsel was ineffective for failing to raise specific *Brady* or *Rosario* material, failing to file an appeal, and failing to inform Petitioner of PRS. (Notice of Motion for Sentence Reduction–Supplemental Brief, Oct. 30, 2007, Indictment Number 1020–2005) The Appellate Division affirmed the sentence on March 4, 2008

without an opinion. *People v. Wilens,* 49 A.D.3d 570 (N.Y.App.Div.2008). Petitioner sought leave to appeal from the Court of Appeals, which was denied. *People v. Wilens,* 10 N.Y.3d 965, 863 N.Y.S.2d 149, 893 N.E.2d 455 (2008).

**\*3** Petitioner then filed a motion under N.Y.C.P.L. § 440.10 ("Pet'r's 440 Mot.") to vacate the judgment with the Suffolk County Supreme Court, arguing that: (1) his plea was not knowingly, intelligently, and voluntarily made because he was not made aware of the PRS, thus violating his due process rights (Pet'r's 440 Mot. at 1–2); (2) he received ineffective assistance of counsel for failing to object to alleged duplicate counts on the indictment, failing to advise him of PRS, and coercing Petitioner to accept the plea agreement (*id.* at 3–4, 863 N.Y.S.2d 149, 893 N.E.2d 455); (3) the allocution was insufficient to cover the elements of the crimes (*id.* at 2, 863 N.Y.S.2d 149, 893 N.E.2d 455); and (4) the prosecutor committed *Brady* and *Rosario* violations for failing to disclose a finding of not guilty to a charge of abuse in Family Court. (*Id.* at 3–4.)

The Suffolk County Supreme Court denied the motion in full. *People v. Wilens,* Ind. No. 01020–2005 (Sup.Ct. Suffolk Cnty. Sept. 10, 2010). First, the court reasoned, based on the record, that Petitioner failed to show how his plea was unknowingly, unintelligently, or involuntarily made. *Id.* Furthermore, the court held that the claim was "wholly based on the record and as such not subject to review in a '440' proceeding."*Id.* (citing N.Y.C.P.L. § 440.10(2)(c); *People v. Byrdsong,* 234 A.D.2d 468, 651 N.Y.S.2d 903 (2d Dep't 1996)). Second, the court concluded that Petitioner failed to support his claim of ineffective assistance of counsel with any evidence other than a self-serving affidavit and was not borne out by the record. *Id.* (citing *People v. Mackenzie,* 224 A.D.2d 173, 637 N.Y.S.2d 128 (1st Dep't 1996)). Third, the court held that "[t]he defendant's claim that the impositions of a period of five years post release supervision was error requiring relief was again record based and not subject to review."*Id.* Fourth, the court held the alleged *Rosario* and *Brady* violations were presented without any evidence and had no merit. However, the court did not specifically address whether there was an insufficient allocution to cover the elements of the crimes (which had been raised in a one-sentence argument by Petitioner).*Id.* The Appellate Division denied Petitioner's certificate for leave to appeal. *People v. Wilens,* A.D. No.2010–10180 (2d Dep't Dec. 23, 2010). Petitioner's motion to reargue the denial of leave to appeal was again denied by the Appellate Division. *People v. Wilens,* A.D. No 2010–10180 (2d Dep't Mar. 31, 2011).

Petitioner then filed a *pro se* Petition for Writ of Habeas Corpus ("Pet'r's Habeas Pet.") on August 22, 2011, raising four grounds for relief. First, Petitioner argues that his plea violated the Due Process Clause of the Fourteenth Amendment because it was not made voluntarily, knowingly, and intelligently, as he was not made aware that PRS was a component of his sentence. (Pet'r's Habeas Pet. at 1.) Second, Petitioner argues that he had ineffective assistance of counsel because his attorney failed to: (1) advise him of the direct consequences of PRS; (2) advise him of his right to appeal; (3) file an appeal; and (4) object to duplicate counts on the indictment.(*Id.* at 3, 863 N.Y.S.2d 149, 893 N.E.2d 455.) Third, Petitioner argues that his allocution was insufficient to support the elements of the crimes charged.(*Id.* at 6, 863 N.Y.S.2d 149, 893 N.E.2d 455.) Finally, Petitioner alleges that the prosecution committed *Brady* and *Rosario* violations by withholding certain medical records and a finding of 'Not Guilty' of abuse in his Family Court case, which related to this criminal matter. (*Id.* at 3–4) Respondent filed a memorandum of law in opposition to the petition on July 27, 2012. ("Resp.Br.") The Court has fully considered the submissions and arguments of the parties.

## II. STANDARD OF REVIEW

**\*4** To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)." 'Clearly established Federal law' " is comprised of " 'the holdings, as opposed to the dicta, of [the

Supreme] Court's decisions as of the time of the relevant state-court decision.' " *Green v. Travis,* 414 F.3d 288, 296 (2d Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."*Williams,* 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case."*Id.* at 413.

AEDPA establishes a deferential standard of review: " 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.' " *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir.2001) (quoting *Williams,* 529 U.S. at 411). Additionally, while " 'some increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Id.* (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.* " *Dolphy v. Mantello,* 552 F.3d 236, 238 (2d Cir.2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir.2006)).

## III. DISCUSSION

For the reasons discussed below, this Court denies the petition for habeas corpus. As a threshold matter, the due process claim is procedurally barred because the state court found that claim to be a record-based claim that is not subject to review in a Section 440 motion. However, in an abundance of caution, the Court has analyzed the merits of every claim and concludes that Petitioner's claims are entirely without merit.

### A. Procedural Bar

### 1. Exhaustion

 **\*5** As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida,* 549 U.S. 327, 333, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007), a petitioner must fairly present his federal constitutional claims to the highest state court having jurisdiction over them. *See Grey v. Hoke,* 933 F.2d 117, 119 (2d Cir.1991). Exhaustion of state remedies requires that a petitioner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 132 L.Ed.2d 865 (1995) (per curiam) (quoting *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)) (alteration in original and quotation marks omitted).

Passage through the state courts, in and of itself, "is not sufficient." *Picard,* 404 U.S. at 275. To provide the State with the necessary "opportunity," the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *see also Duncan,* 513 U.S. at 365–66. "A petitioner has fairly presented his claim only if he has informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Jones v. Keane,* 329 F.3d 290, 294–95 (2d Cir.2003) (citation and internal quotation marks omitted). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye v. Att'y Gen. Of N.Y.,* 696 F.2d 186, 191– 92 (2d Cir.1982) (en banc). To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Id.* at 191–92 (footnote omitted).

### 2. State Procedural Requirements

Similar to the failure to exhaust a claim, the failure to satisfy the state's procedural requirements will deprive the state

courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claim. *Coleman v. Thompson,* 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). "[A] claim is procedurally defaulted for the purposes of federal state habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.' " *Reyes v. Keane,* 118 F.3d 136, 140 (2d Cir.1997) (quoting *Coleman,* 501 U.S. at 735) (emphasis omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are ... to be deemed exhausted." *DiGuglielmo v. Smith,* 366 F.3d 130, 135 (2d Cir.2004). Notably, for exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Reyes,* 118 F.3d at 139 (citations and internal quotation marks omitted).

 **\*6** However, even where a plaintiff properly exhausts his claim, exhaustion "does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo,* 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (citing *Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Coleman,* 501 U .S. at 744–51)). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Gray,* 518 U.S. at 162.

The procedural bar rule in the review of applications for writs of habeas corpus is based on the "comity and respect" accorded to state judgments. *House v. Bell,* 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Coleman,* 501 U.S. at 730–31.

Once it is determined that a claim is procedurally barred under state rules, a federal court may review such a claim on its merits only if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Id.* at 750. A miscarriage

of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier,* 477 U.S. 478, 496 (1986). To overcome procedural default based on miscarriage of justice, petitioner must demonstrate that in light of new reliable evidence not presented at trial, " 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt' " and would require " 'new reliable evidence ... that was not presented at trial.' " *House,* 547 U.S. at 537 (quoting *Schlup v. Delo,* 513 U.S. 324, 327 (1995)).

### 3. Application

"The burden of proving exhaustion lies with the habeas petitioner."*Cartagena v. Corcoran,* No. 04–CV–4329, 2009 WL 1406914, at *3 (E.D.N.Y. May 19, 2009). The Court concludes that Petitioner has not met this burden with respect to his due process claim, as it was not "fairly presented" in state court. Petitioner never sought reversal of his conviction, but rather merely sought a sentence reduction under state law. As discussed *supra,* Petitioner on direct appeal argued to reduce his sentence under N.Y.Crim. Proc. Law 470.15(2) (c) and 470.20(6), claiming that it was harsh and excessive. Courts have correctly found that a prisoner's reliance on a state procedural law granting courts discretionary authority to reduce sentences does not "fairly present" a constitutional claim in state court. *King v. Cunningham,* 442 F.Supp.2d 171, 181 (S.D.N.Y.2006) (collecting cases); *Castillo v. Abrams,* No. 88–CV–1165, 1988 WL 96026, at *1–2 (S.D.N.Y. Aug. 24, 1988) ("Asking a state court to use its discretionary authority to reduce a sentence [under New York's Criminal Procedure Laws], without more, is not enough to alert the court that the claim is of constitutional dimension.") Accordingly, Petitioner's due process claim is unexhausted, and thus, cannot be reviewed by this Court.

**\*7** However, Petitioner, through his § 440.10 motion to vacate, did seek reversal on the same grounds that he alleges in this petition-namely, (1) due process violations because the plea was not knowingly made; (2) ineffective assistance of counsel; (3) insufficient allocution; and (4) *Brady* and *Rosario* violations. Petitioner also argued that post-release supervision should not have been imposed. The Supreme Court of Suffolk County, through its § 440.10 order, made clear that the due process claim was procedurally barred because it was recordbased. *People v. Wilens,* Ind. No. 01020–2005 (Sup.Ct. Suffolk Cnty. Sept. 10, 2010). Accordingly, Petitioner's claim that his plea was not knowingly and voluntarily made is procedurally barred

because the court's ruling was based on an independent and adequate state procedural rule. [3]

In order to overcome the procedural bar, Petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."*Coleman,* 501 U.S. at 750. Petitioner has not satisfied this standard. Petitioner has not provided any explanation for his failure to properly exhaust the due process claim. Moreover, Petitioner has failed to demonstrate any prejudice for his failure to exhaust, and he has not demonstrated that a fundamental miscarriage of justice will take place if the Court fails to consider the procedurally defaulted claims. *Sawyer v. Whitley,* 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). In any event, that claim, as well as all of Petitioner's other claims, are without merit for the reasons discussed below.

### B. Merits Analysis

### 1. Due Process Claim

Petitioner claims that his due process rights under the Fourteenth Amendment were violated because he was unaware of PRS accompanying his sentence. Therefore, he alleges that the plea was not made voluntarily, knowingly, and intelligently. As discussed below, this claim has no merit.

### a. Legal Standard

"The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant ."*Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (internal quotation marks and citations omitted)); *see also Parke v. Raley,* 506 U.S. 20, 28–29, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992) (plea is valid when it is both knowingly and voluntarily made). Where "a defendant is represented by counsel during the plea process, and enters his plea upon the advice of counsel, the voluntariness of the plea depends upon whether counsel's advice was within the range of competence demanded of attorneys in criminal cases."*Hill,* 474 U.S. at 56 (internal quotation marks and citations omitted).

The Supreme Court has held that, under the Due Process Clause of the United States Constitution, a trial court can only accept a guilty plea which is done "voluntarily, knowingly, and intelligently, with sufficient awareness of relevant

circumstances and likely consequences." *United States v. Adams,* 448 F.3d 492, 497 (2d Cir.2006) (internal quotation marks and citations omitted); *accord Godinez v. Moran,* 509 U.S. 389, 400, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). Although a guilty plea "is not ordinarily subject to collateral attack," it "may be collaterally attacked if it was not knowing or not voluntary...." *Salas v. United States,* 139 F.3d 322, 324 (2d Cir.1998); *see also U.S. ex rel Scott v. Mancusi,* 429 F.2d 104, 107 (2d Cir.1970) ("[A] conviction which is based upon an involuntary plea of guilty is inconsistent with due process of law and is subject to collateral attack by federal habeas corpus.").

**\*8** "A plea is considered 'intelligent if the accused had the advice of counsel and understood the consequences of his plea, even if only in a rudimentary way,' and it is considered 'voluntary if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally.' " *Manzullo v. New York,* No. 07 CV 744(SJF), 2010 WL 1292302, at \*5 (E.D.N.Y. Mar.29, 2010) (quoting *Miller v. Angliker,* 848 F.2d 1312, 1320 (2d Cir.1988)). Indeed, a "plea of guilty entered by one fully aware of the direct consequences of the plea is voluntary in a constitutional sense unless induced by threats, misrepresentations, or perhaps by promises that are by their nature improper." *Bousley v. United States,* 523 U.S. 614, 619, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (internal alteration, citations, and quotation marks omitted).

**b. Application**

Under New York law, the trial court should have advised Petitioner of the five-year mandatory PRS. In *People v. Catu,* the Court of Appeals held that "[b]ecause a defendant pleading guilty to a determinate sentence must be aware of the postrelease supervision component of that sentence in order to knowingly, voluntarily and intelligently choose among alternative courses of action, the failure of a court to advise of postrelease supervision requires reversal of the conviction." 4 N.Y.3d 242, 245, 792 N.Y.S.2d 887, 825 N.E.2d 1081 (2005).

However, under AEDPA, this Court may only grant relief if the state court "unreasonably applied clearly established Federal law." *Carey v. Musladin,* 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (alterations omitted) (quoting 28 U.S.C. § 2254(d)(1))." 'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.' " *Green v. Travis,* 414 F.3d 288, 296 (2d

Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Therefore, this Court cannot grant a petition for habeas corpus if the state court unreasonably applied *state* law; instead, this Court may only grant relief unless the state court unreasonably applied federal law that has been clearly defined by Supreme Court precedents (or was a result of an unreasonable determination of the facts in light of the record).*See Knowles v. Mirzayance,* 556 U.S. 111, 122, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) ("[T]his Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (citations and internal quotation marks omitted)).

"Unfortunately for Petitioner, there is no clearly established Supreme Court precedent that a defendant must be advised of mandatory post-release supervision prior to entering a guilty plea. Many federal courts in this Circuit have recently come to this same conclusion."*Sanchez v. Keller,* 06–CIV–3370, 2007 WL 4927791, at \*7 (S.D.N.Y. Dec.4, 2007) (Report and Recommendation); *see also Facen v. Cully,* 787 F.Supp.2d 278, 284 (W.D.N.Y.2011) (stating that "the Supreme Court has never held that a mandatory term of post-release supervision is a direct consequence of a criminal conviction"); *Potter v. Green,* 04–CV–1343, 2009 WL 2242342, at \*6 (E.D.N.Y. July 24, 2009) ("[T]here is no clearly established Supreme Court precedent that requires a state court judge to advise a defendant of mandatory PRS before accepting a guilty plea."). In fact, as noted by the Seventh Circuit, "the Court has expressly declined to decide such an issue in the very similar context of parole."*Lockhart v. Chandler,* 446 F.3d 721, 724 (7th Cir.2006) (citing *Lane v. Williams,* 455 U.S. 624, 630 n. 9, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982)). This Court finds the analysis contained in these cases persuasive.

**\*9** Therefore, because the Supreme Court has not ruled directly on this issue, the failure of the state court to advise Petitioner at his plea about the mandatory PRS is not a basis for habeas relief. *See Sanchez,* 2007 WL 4927791, at \*8 ("[B]ecause the Supreme Court has never addressed the issue of whether mandatory supervised release is a direct consequence of one's conviction, the trial court's failure to inform Petitioner of his mandatory PRS cannot be a violation of clearly established federal law. In other words, Petitioner's claim is without merit because there is no clearly established Supreme Court precedent for the trial court to have unreasonably applied."); *see also Lane,* 446 F.3d at 724;

*Facen,* 787 F.Supp.2d at 284; *Menjivar v. Sears,* 06 CV 2854, 2007 WL 2274892, at *3 (E.D.N.Y. Aug.7, 2007). [4]

In addition, although this could end the Court's inquiry, the Court notes that Petitioner must also demonstrate that "there is a reasonable probability that, but for the error, he would not have entered the plea." *Zhang v. United States,* 506 F.3d 162, 168 (2d Cir.2007) (citation and internal quotation marks omitted). Petitioner provides no evidence that he would not have entered his guilty plea had the court informed him of the mandatory PRS, and it appears highly improbable that the PRS played any role in his decision to accept or reject the plea. In fact, during the sentencing hearing, Petitioner admitted that the plea bargain, struck by him and for his benefit, was "favorable." [5] (S. at 7.) More importantly, Petitioner was made aware of the PRS at his sentencing hearing. For each charge, the sentencing state judge, informed Petitioner of the mandatory five-year PRS accompanying the charges. (S. at 10.) At no time did Petitioner object to the PRS, indicate that he was unaware that PRS was mandated in accordance with state law, or state that he wished to withdraw his previously entered plea. Therefore, as in *Sanchez,* "Petitioner's claim-that the failure to inform him of mandatory PRS prior to the entry of his guilty plea was a violation of his due process rights-can be dismissed as harmless error, because even if he had know about the PRS, such knowledge would likely not have affected his decision." *Sanchez,* 2007 WL 4927791, at *9.

### 2. Ineffective Assistance of Counsel

Petitioner contends that he received ineffective assistance of counsel, specifically that his counsel failed to object to duplicate counts on the indictment, failed to file a Notice of Appeal, and failed to advise him of the PRS accompanying the guilty plea. As discussed below, this claim is meritless.

### a. Legal Standard

Under the standard promulgated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id. at 680, and (2)* "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id. at 694.*

**\*10** The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.' " *Greiner v. Wells,* 417 F.3d 305, 319 (2d Cir.2005) (quoting *Strickland,* 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a " 'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.' " *Id.* (quoting *Rompilla v. Beard,* 545 U.S. 374, 408, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)). In assessing performance, a court "must apply a 'heavy measure of deference to counsel's judgments.' " *Id.* (quoting *Strickland,* 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord,* 77 F.3d 578, 588 n. 3 (2d Cir.1996), and " 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " *Id.* at 588 (quoting *Strickland,* 466 U.S. at 690–91). "However, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Id.* (quoting *Strickland,* 466 U.S. at 690–91).

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that they " 'undermine[ ] confidence in the outcome.' " *Pavel v. Hollins,* 261 F.3d 210, 216 (2d Cir.2001) (quoting *Strickland,* 466 U.S. at 694). " '[T]he question to be asked in assessing the prejudice from counsel's errors ... is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilty.' " *Henry v. Poole,* 409 F.3d 48, 63–64 (2d Cir.2005) (quoting *Strickland,* 466 U.S. at 695). " 'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.' " *Lindstadt v. Keane,* 239 F.3d 191, 204 (2d Cir.2001) (quoting *Strickland,* 466 U .S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of Strickland, the determination of prejudice may be made with the benefit

of hindsight ." *Hemstreet v. Greiner,* 491 F.3d 84, 91 (2d Cir.2007) (internal citation and quotation marks omitted).

**\*11** This Court proceeds to examine Petitioner's claim, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin,* 366 F.3d 95, 100 (2d Cir.2004).

**b. Application**

**i. Failure to Object to Duplicate Counts on the Indictment**

Petitioner alleges that his trial counsel failed to object to duplicate counts contained within the indictment. Specifically, Petitioner asserts that under N.Y. Penal Law § 130.75(2) and N.Y. Penal Law § 130.80(2), a defendant may not be subsequently prosecuted for any other sexual offense involving the same victim. Petitioner argues that he was charged twice for acts upon the same victim under Counts I and III, and for Counts II and IV, and that he suffered prejudice as a result of the his attorney's inaction.

First, this Court finds defense counsel's conduct was not deficient because he sought to have the indictment dismissed on any plausible grounds. Defense counsel filed a motion for the trial court to review the Grand Jury minutes and sought dismissal of the charges. The court, in response to counsel's motion, concluded that the minutes were sufficient and denied counsel's application to dismiss or reduce the charges. *People v. Wilens,* Ind. No. 1020–2005 (Sup.Ct., Suffolk Cnty. July 26, 2005).

Second, Petitioner has failed to show that these alleged duplicate counts caused any prejudice and thus fails the second prong under the *Strickland* test. The New York legislature was careful to avoid double jeopardy concerns under N.Y. Penal Law § 130 .75(2) and § 130.80(2) by enacting N.Y. Penal Law § 70.25(2)(e).N.Y. Penal Law § 70.25(2)(e) states:

> Whenever a person is convicted of course of sexual conduct against a child in the first degree as defined in section 130.75 or course of sexual conduct against a child in the second degree as defined in section 130.80 and any other crime under article one hundred thirty committed against the same child and within the

period charged under section 130.75 or 130.80, the sentences *must run concurrently.*

N.Y. Penal Law § 70.25(2)(e) (emphasis added). At sentencing, Petitioner was sentenced to fourteen years and seven years for Counts One and Three, respectively. For Counts Two and Four, the state judge again sentenced the Petitioner to fourteen and seven years, respectively. The sentences were to run concurrently, not consecutively. Therefore, Petitioner was not subject to prejudice, and his claim must fail.

Furthermore, by pleading guilty, the Petitioner waived any argument that counsel was ineffective for failing to challenge the indictment. *See Schwartz v. Connell,* 05 CIV. 10305, 2006 WL 3549660, at \*5 (S.D.N.Y. Dec.6, 2006) ("A motion to dismiss for a duplicitous indictment is similar to a speedy trial motion in that both can result in a dismissal of charges against the defendant. Both errors, however, are rendered irrelevant in the face of defendant's plea of guilty since this admission is, in most cases, convincing factual evidence of actual guilt."); *People v. Thomas,* 2 A.D.3d 982, 768 N.Y.S.2d 519, 520 (3d Dep't 2003) (holding a claim of ineffective assistance of counsel, predicated on counsel's failure to challenge the indictment, was waived as the alleged failures did not undermine the voluntariness of defendant's guilty plea). [6]

**ii. Failure to File a Notice of Appeal**

**\*12** Petitioner claims that his trial counsel was ineffective because counsel did not file a Notice of Appeal. In *Roe v. Flores–Ortega,* 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000), the Supreme Court applied the *Strickland* test with regard to a claim that counsel was constitutionally ineffective for failing to file a Notice of Appeal. The Court noted that it had "long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable."*Id.* at 477.However, the Court held that, in cases where the defendant "neither instructs counsel to file an appeal nor asks that an appeal not be taken," the first question is whether counsel "in fact consulted with the defendant about an appeal."*Id.* at 478.If the attorney consulted with the defendant, counsel "performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal."*Id.* If, however, counsel has not consulted with the defendant, the relevant inquiry is "whether counsel's failure

to consult with the defendant itself constitutes deficient performance."*Id.* The Court rejected a bright-line rule that counsel must always consult with a defendant regarding an appeal. *Id.* at 480.Instead, the Court held that "counsel has a constitutionally-imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal ... or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing."*Id.* In making this determination, courts should consider "whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings."*Id.* Where a defendant pleads guilty, courts should consider factors such as "whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights."*Id.* If the court determines that counsel's performance was deficient, the court must turn to the second prong of the *Strickland* rule-whether counsel's deficient performance prejudiced the defendant. "[T]o show prejudice in these circumstances, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed."*Id.* at 484.If so, a presumption of prejudice arises. *Id.*

In the instant case, Petitioner, in his *pro se* appellate brief, repeatedly states that he attempted to contact and inform his attorney to file an appeal, but his attempts were futile. (Pet'r's Habeas Pet. at 3.) Assuming that no such consultation occurred, the relevant question becomes whether "there is reason to think either (1) that a rational defendant would want to appeal, or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing."*Flores–Ortega,* 528 U.S. at 480.

 **\*13** Petitioner pled guilty, which "reduces the scope of potentially appealable issues" and "may indicate that the defendant seeks an end to judicial proceedings."*Id.* However, Petitioner has a right to appeal, and his attorney must respect this right. Assuming *arguendo* that counsel's performance was deficient for failing to appeal or failing to consult Petitioner about an appeal, that deficiency did not create any prejudice and fails the second prong of *Strickland.*Petitioner filed his own Notice of Appeal in a timely manner. Subsequently, Petitioner was assigned appellate counsel. Appellate counsel filed a motion with the Appellate Division to reduce Petitioner's sentence and Petitioner was able to file

his own *pro se* supplemental brief. Not only did appellate counsel raise what he believed to be a meritorious issue on appeal, but Petitioner himself raised his own issues. Both motions were heard and subsequently denied. Therefore, Petitioner did not suffer any prejudice. *See id.* at 484 (rejecting rule that failure to file appeal results in prejudice *per se* because this rule "ignores the critical requirement that counsel's deficient performance must actually cause *the forfeiture of the defendant's appeal.*") (emphasis added).

### iii. Failure To Advise Him Of The Mandatory PRS Accompanying The Guilty Plea

Petitioner alleges his defense counsel was ineffective for failing to advise him of the mandatory post-release supervision, which accompanied his guilty plea. This argument fails the second prong under the *Strickland* test because Petitioner cannot show prejudice based on his lack of knowledge. Under *Strickland,* a habeas petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."*Strickland,* 466 U.S. at 694. Nothing in the record indicates that Petitioner would not have pled had he been informed of the mandatory PRS. *Walker v. Pearlman,* 556 F.Supp.2d 259, 265 (S.D.N.Y.2008) (holding that knowledge of a five-year PRS period would have not changed the defendant's plea).

Petitioner does allege that, had he known about the PRS, he would not have pled guilty. In fact, Petitioner was made fully aware of PRS at his sentencing hearing, and made no objection or any attempt to withdraw his guilty plea. In his *pro se* supplemental brief to the Appellate Division on appeal, Petitioner again did not seek to withdraw his guilty plea. Furthermore, as stated above, had Petitioner gone to trial and been found guilty of the charges, he faced two life sentences. In addition, any period of incarceration connected with these charges carries with them a mandatory period of post-release supervision.N.Y. Penal Law § 70.80(3). Under the circumstances, even assuming *arguendo* the allegation of ineffective assistance to be true, there is no basis to conclude that Petitioner suffered any prejudice under the second prong of *Strickland.*

### 3. Insufficient Allocution

 **\*14** Petitioner alleges his allocution was insufficient in establishing the elements of the crimes of which he was convicted. For the reasons stated, the Court finds this claim to be without merit. [7]

**i. Allocution Under Penal Law § 130.75(1)(a) (Course of sexual conduct against a child in the first degree)**

In analyzing the transcript of the plea, it is clear that Petitioner provided a sufficient allocution for each element of the crimes charged. N.Y. Penal Law § 130.75(1) (Course of sexual conduct against a child in the first degree) reads:

A person is guilty of course of sexual conduct against a child in the first degree when, over a period of time not less than three months in duration:

(a) he or she engages in two or more acts of sexual conduct, which includes at least one act of sexual intercourse, oral sexual conduct, anal sexual conduct or aggravated sexual contact, with a child less than eleven years old

N.Y. Penal Law § 130.75(1). Under this statute, the prosecutor must show that over a three-month period or more, the defendant engaged in at least two acts of sexual conduct.

Petitioner admitted in great detail to the specific oral sexual conduct between himself and the victims, which occurred well over a three-month period. Petitioner also admitted that these victims were children under the age of eleven. In particular, during the allocution, petitioner admitted in part that, (1) within a three-month period between 2002 and 2004, on at least three occasions at his residence in Suffolk County, he subjected the female child "DM" (who was under the age of eleven) to sexual contact and sexual intercourse for Petitioner's sexual gratification (P. 7–8); and (2) within a three-month period from between September 2003 and July 2004, on at least three occasions at his residence, Petitioner had sexual contact with the male child "DM" (who was under the age of 11), including one incident of oral sexual conduct. (P. 8–12.) Petitioner's allocution covered all of the requisite elements and was sufficient to find him guilty of the charges under Penal Law § 130.75(1)(a) (Course of sexual conduct against a child in the first degree).

**ii. Allocution under Under Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree)**

In relevant part, N.Y. Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree) reads:

A person is guilty of course of sexual conduct against a child in the second degree when, over a period of time not less than three months in duration:

(a) he or she engages in two or more acts of sexual conduct with a child less than eleven years old.

N.Y. Penal Law § 130.80(1)(a). Under this statute, the prosecutor must show that over a three-month period or more, the defendant engaged in two or more acts of sexual conduct with a child less than eleven years old. "Sexual conduct" means sexual intercourse, oral sexual conduct, anal sexual conduct, aggravated sexual contact, or sexual contact. N.Y. Penal Law § 130.00(10).

**\*15** The plea transcript provides sufficient evidence that Petitioner is guilty under N.Y. Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree). As discussed supra, Petitioner admitted to sexual conduct with a child under the age of eleven. He also admitted that this conduct occurred for a period of at least three months. Moreover, he allocuted to conduct that clearly fell within the definition of oral sexual conduct. (P. 9–11 .) Thus, each element under Penal Law § 130.80(1)(a) was satisfied.

Petitioner furthers argues that dialogue between the prosecutor and himself during the plea was insufficient to support the charge because his admission was preceeded by six denials. (Pet'r's Habeas Pet. at 2.) He asserts that the state court should have, "looked further into the reasons of denials of alleged acts before accepting the insufficient pleas."(*Id.* at 2.)

The Court disagrees. By looking at the totality of the guilty plea proceeding, instead of a few isolated lines as Petitioner suggests, it is clear that the plea was voluntary. There is no evidence that the prosecutor or anyone else threatened Petitioner to induce a coerced plea. The court simply gave Petitioner another opportunity to explain what had occurred. Subsequently, Petitioner provided a sufficient allocution and made a proper plea. In short, there is no basis to challenge the Petitioner's statements at the guilty plea, including the voluntariness of those statements.

**iii. Allocution Under Penal Law § 130.65 (Sexual Abuse in the First Degree)**

N.Y. Penal Law § 130.65 (Sexual Abuse in the First Degree) states that "[a] person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact: ... [w]hen the other person is less than thirteen years old and the actor is twenty-one years old or older."N.Y. Penal Law § 130.65.

The record is clear that the prosecution satisfied every element of this charge. Petitioner described in great detail sexual acts which satisfy subsection 4 of N.Y. Penal Law § 130.65. Petitioner, by his own admission, subjected his victims, who were all under the age of thirteen, to sexual contact. Because the Petitioner is older than twenty-one years of age, the elements are satisfied, and thus his allocution was sufficient.

### iv. Allocution Under Penal Law § 260.10(1) (Endangering the Welfare of Child)

Lastly, under the N.Y. Penal Law § 260.10(1) (Endangering the Welfare of Child):

> A person is guilty of endangering the welfare of a child when:
>
> 1. He or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his or her life or health.

N.Y. Penal Law § 260.10(1). There is no requirement under this statute that the physical, mental or moral welfare of the child be in fact injured, and New York courts have held that actions similar to the ones admitted to by Petitioner violate the statute. *See, e .g., People v. Rice,* 17 N.Y.2d 881, 271 N.Y.S.2d 307, 218 N.E.2d 341 (1966); *People v. Dunavin,* 173 A.D.2d 1032, 1034, 570 N.Y.S.2d 369 (3d Dep't 1991) (evidence demonstrating that defendant showed minors sexually explicit film combined with touching minor's buttocks legally sufficient to establish crime of endangering welfare of child). The Court concludes that Petitioner's allocution under Penal Law § 260.10(1) (Endangering the Welfare of Child) was sufficient to satisfy all elements of the crime alleged. (P. 14–16.)

**\*16** In sum, Petitioner's claim that his allocution did not satisfy the elements of the crimes charged is plainly without merit.

### 4. *Brady* and *Rosario* Violations

Petitioner also claims *Brady* and *Rosario* violations, alleging that the prosecution withheld certain exculpatory evidence-namely, the victims' medical records and a finding of 'Not Guilty' in his Family Court case, which related to this criminal matter. (Pet. at 3–4) For the reasons set forth below, the Court finds that Petitioner's claim is without merit.

### a. Legal Standard

For the purposes of federal habeas corpus review, a habeas petition can only be granted to remedy some violation of federal law. Because the obligation to turn over *Rosario* material arises under state law, to the extent that this claim is based on a *Rosario* violation, it must fail. Thus, the only question is whether the prosecution violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. *See King v. Greiner,* No. 02–CV–5810, 2008 WL 4410109, at *38 n. 41 (S.D.N.Y. Sept.26, 2008).

Under *Brady,* the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."373 U.S. at 87. In order to prevail on a *Brady* claim, petitioner must demonstrate that material evidence favorable to his case was not disclosed to him. *See Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("[T]he prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.")."Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Failure to disclose such material evidence merits relief only if the prosecution's failure " 'undermines confidence in the outcome of the trial.' " *Kyles,* 514 U.S. at 434 (quoting *Bagley,* 473 U.S. at 678). Furthermore, "[t]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281.

### b. Application

Petitioner argues that the outcome of his case would have been different if the prosecutor submitted medical records and a Family Court verdict of 'Not Guilty' of sexual abuse. Analyzing these claims, the Court finds them to be meritless. With regard to the Family Court adjudication, Petitioner makes conclusory statements without providing a shred of evidence before the Court beside his self-serving declaration.

The state record is devoid of any documentation from Family Court, which would be classified as exculpatory under *Brady.* Additionally, Petitioner failed to produce an affidavit from his attorney attesting to a favorable adjudication in the Family Court. In fact, Respondent submitted to the state court, in response to his Section 440 motion, court documents from Family Court indicating that the abuse petitions were granted on September 23, 2005. (Opp. to Section 440 Motion, Ex. B.)

**\*17** In any event, Petitioner was presumably present in Family Court during the proceedings. Therefore, he was aware of the evidence allegedly withheld, removing it from the scope of *Brady* material. Lastly, as noted above, a final Family Court disposition took place on September 23, 2005. Petitioner pled guilty in Criminal Court on August 30, 2005. There can be no argument that this disposition, which took place later in time, could have possibly influenced the outcome of his guilty plea (which had already taken place).

Similarly, the medical records at issue are neither exculpatory nor favorable to Petitioner. The medical records specifically state that the victims' medical history indicates that "inappropriate sexual contact" occurred. This statement is certainly not favorable to Petitioner. Although the records state that there were no abnormal findings *during* the exam, this has no bearing on whether the victims were abused in the past by Petitioner. Moreover, the medical record qualifies the examination by stating that the alleged acts would not cause "permanent changes in the patient's physical exam."Therefore, the medical records do not exculpate Petitioner and, thus, cannot be classified as *Brady* material. [8]

In sum, Petitioner's *Brady* and *Rosario* claims are without merit and do not provide a basis for habeas relief.

### IV. CONCLUSION

For the reasons set forth herein, this Court finds that Petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. All of Petitioner's claims are plainly without merit. Therefore, the petition for a writ of habeas corpus is denied. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall be issued. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2014 WL 28995

### Footnotes

1    "P." refers to the plea transcript.

2    "S." refers to the sentencing transcript.

3    The Court did not address Petitioner's claim that his allocution was insufficient and it would appear that this claim is not cognizable on a § 440.10 motion to vacate. However, when a state court fails to address a claim, a Court must review it *de novo.See Cotto v. Fischer,* 09 CV 9813, 2012 WL 5500575, at \*39 (S.D.N.Y. Aug.23, 2012). As a threshold matter, Petitioner only addressed this matter in a conclusory manner without any argument as to the specific challenge being made. Thus, the issue was not fairly presented to the state court. In any event, as addressed *infra,* the Court has reviewed this claim and finds it to be plainly without merit.

4    As stated *supra,* even if the state court did violate New York law, Petitioner is also not entitled to relief because this claim is procedurally barred.

5    As Respondent notes, "All terms of incarceration were ordered to run concurrently, for an aggregate sentence of fourteen years for his sexual assaults and lewd behavior against eight children. Had petitioner gone to trial and been found guilty, as a second child sexual assault felony offender, petitioner faced a maximum sentence of two life terms, plus 48 years."(Resp. Opp. at 11.)

6    The Court notes that, for the reasons discussed *infra,* Petitioner has not made any plausible argument that his guilty plea was not voluntary and intelligent that would allow him to now argue that this argument should not be waived.

7    The state court did not address Petitioner's contention that his allocution at his plea was insufficient, and thus, this claim is not entitled to AEDPA deference. *See, e.g., Bell v. Napoli,* 08 CIV 9900, 2010 WL 8039333, at \*23 n. 13 (S.D.N.Y. Aug.24, 2010) (Report and Recommendation). However, even under *de novo* review, Petitioner's claim is plainly without merit.

8    In any event, such claims cannot provide a basis for habeas relief. The Supreme Court has never held that exculpatory material must be disclosed prior to a guilty plea. Therefore, a state court decision on that issue could not have been

"contrary to clearly established federal law, as determined by the Supreme Court of the United States."28 U.S.C. § 2254(d)(1). A habeas petition may not be granted on an issue of law that has not yet been resolved. *See Friedman v. Rehal,* 618 F.3d 142, 154–55 (2d Cir.2010) (discussing *Ruiz* and holding that, because no clearly established federal law has been established as to the application of *Brady* to a guilty plea, such a claim was not cognizable on habeas review).

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.